**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
CHARLOTTESVILLE DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | **Case No. 3:18-cr-25** |
| **BENJAMIN DALEY** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MOTION TO DISMISS THE INDICTMENT

Under Federal Rule of Criminal Procedure 12(b)(3) and the First, Fifth, Sixth, and Tenth Amendments to the United States Constitution, the Defendant, Benjamin Daley respectfully moves to dismiss Counts One and Two of the Indictment for failure to state an offense.

Count Two (Travel with Intent to Riot, 18 U.S.C. § 2101, the "Anti-Riot Act") does not allege facts sufficient to establish that Mr. Daley traveled with the requisite intent, or that he "incited" or "urged" others to engage in riot, or that there was ever a riot. Moreover, Count Two is otherwise irremediably vague and lacking in specificity. Count Two is also unconstitutional because the First Amendment precludes the Anti-Riot Act from applying to disorder arising from a political demonstration, and because it impermissibly seeks to punish Mr. Daley for constitutionally-protected speech. Finally, Count Two fails because 18 U.S.C. § 2101 exceeds Congress's Commerce Clause authority.

Count One (Conspiracy to Riot, 18 U.S.C. § 371) is barred by Wharton's Rule, which precludes charging a conspiracy where the object offense proscribes concerted action by multiple individuals, as the Anti-Riot Act does. Further, Count One is unconstitutional for the same reasons as Count Two.

1

## OFFENSES CHARGED

Count One of the Indictment charges that Mr. Daley conspired to commit an offense against the United States in violation of 18 U.S.C. § 371. ECF 8. The offense alleged to be the object of the conspiracy is the Anti-Riot Act, 18 U.S.C. § 2101 which criminalizes travel in interstate commerce with the intent to riot. Count Two of the indictment charges Daley with the substantive offense of traveling in interstate commerce with the intent to riot, in violation of 18 U.S.C. § 2101, and aiding and abetting the commission of that offense.

To establish a conspiracy under § 371, the government must prove "(1) an agreement between two or more people to commit a crime, and (2) an overt act in furtherance of the conspiracy." *United States v. Kingrea*, 573 F.3d 186, 195 (4th Cir. 2009) [citation omitted]. In this case the government must prove that Daley agreed with at least one person to travel in interstate commerce with the intent to riot, in violation of 18 U.S.C. § 2101.

To convict Daley under Count Two, the government must prove that Daley traveled in interstate commerce "with the intent to incite, organize, promote and encourage a riot." *United States v. Dellinger*, 472 F.2d 340 (7th Cir. 1972), certiorari denied, 93 S.Ct. 1443, 410 U.S. 970, L.Ed.2d (706). The terms "riot" and "to incite a riot" are defined in 18 U.S.C. § 2102.

## FACTUAL BACKGROUND FROM INDICTMENT

For purposes of this Motion to Dismiss, the Court must accept, as alleged, the facts cited in the Indictment.

The Indictment alleges that an event referred to as the "Unite the Right" rally was organized and scheduled to occur on August 12, 2017, at Emancipation Park in Charlottesville, Virginia. ¶ 1.

2

On August 11, 2017, the Indictment alleges that hundreds of individuals engaged in a torch-lit march on or around the grounds of the University of Virginia in Charlottesville, Virginia. ¶ 2. The participants engaged in chants and expressed white-supremacist and other racist and anti-Semitic view. *Id.* The march culminated near the University of Virginia's Rotunda where a small group of students had gathered around a statute of Thomas Jefferson to protect it from the torch-lit march. *Id.* As march participants encircled the statute and surrounded the students "[v]iolence ensued." *Id.*

On August 12, 2017, numerous individuals, many belonging to groups affiliated with various political persuasions, attended the Unite the Right rally. ¶ 3. After "several instances of violence prior to the scheduled start of the rally," law enforcement declared an "unlawful assembly" and required rally participants to disperse from Emancipation Park." *Id.*

The Indictment alleges Mr. Daley is a resident of California and that he associated with a white-supremacist organization that became known as the Rise Above Movement or RAM. ¶ 4. RAM identified itself as "alt-right" and "nationalist" and its members and associates posted videos of physical training and mixed martial arts street-fighting techniques along with references to their beliefs. ¶ 5. "RAM and its members and associates also expressed, through various social-media platforms and other means, anti-Semitic, racist, and white-supremacist views and promoted violence against those they belied held opposing political views." ¶ 6. Between March 2017 and August 2017, RAM and its members and associates including Mr. Daley traveled to political rallies and organized demonstrations in California and Virginia "where they prepared to and engaged in acts of violence against numerous individuals." ¶ 7.

The indictment alleges that as early as March 2017, Mr. Daley did "knowingly and willfully conspire, combine, confederate, and agree together with" his co-defendants and with

other individuals to violate 18 U.S.C. § 2101. ¶ 9. The indictment also alleges Mr. Daley traveled with intent to violate 18 U.S.C. § 2101. ¶ 12-13.

The Indictment alleges "overt acts" including Mr. Daley's prior travel to attend political rallies in Huntington Beach, CA on March 25, 2017, and in Berkeley, CA in April 15, 2017, where he allegedly "committed, participated in, and aided and abetted one or more acts of violence against individuals attending the purported political rall[ies]." ¶ 10a-e.

The Indictment then alleges preparations Mr. Daley took to attend the Unite the Right rally on August 12, 2017, in Charlottesville, VA, including arranging flights and securing lodging. ¶ 10f-h. Once in Charlottesville Mr. Daley allegedly purchased athletic tape and baseball helmets and obtained a torch to attend the August 11, 2017 march. ¶ 10j.

The Indictment then alleges that on the evening of August 11, 2017 on the grounds of the University of Virginia in Charlottesville, Virginia, Mr. Daley "incited, promoted, encouraged, participated in, and carried on in a riot, committed acts of violence in furtherance of a riot, and aided and abetted other persons inciting and participating in and carrying on in a riot and committing acts of violence in furtherance of a riot." ¶ 10k; ¶ 13a.

The Indictment alleges that Mr. Daley prepared to commit acts of violence on August 12, 2017, "by, among other things, wrapping [his] hands with athletic tape." ¶ 10l. The Indictment then repeats the same general allegation that "[o]n or about August 12,2017, [Mr. Daley] incited, promoted, encouraged, participated in, and carried on in a riot, committed acts of violence in furtherance of a riot, and aided and abetted other persons inciting and participating in and carrying on in a riot and committing acts of violence in furtherance of a riot" in and around the vicinity of Emancipation Park in Charlottesville, Virginia. ¶ 10m; 13b. Finally, the Indictment alleges that Mr. Daley returned to California in the days following August 12, 2017. ¶ 10o.

4

## JUDICIAL NOTICE OF FACTUAL BACKGROUND FROM MEMORANDUM
## OPINION IN *KESSLER v. CITY OF CHARLOTTESVILLE*

Under Federal Rule of Evidence 201(b), a court "may judicially notice a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."  In *United States v. Pulliam*, 2014 WL 3615776, *1 (D. Mon. July 21, 2014), a district court took judicial notice of documents and opinions of a bankruptcy court on the basis that court documents are matters of public record.  *See also United States v. Marsalis*, 314 F. Supp. 3d 462 (E.D.N.Y. 2018) (taking judicial notice of Defendant's prior convictions in ruling on motion to dismiss indictment for failure to state an offense under Armed Career Criminal Act); *United States v. Esquivel*, 88 F.3d 722, 726 (9th Cir. 1996) (taking judicial notice of matters in considering appeal of motion to dismiss indictment); *United States v. Gordon*, 634 F.2d 639, 642 (1st Cir. 1980) (noting district court was free to take judicial notice of certain prior proceedings in considering motion to dismiss indictment); *United States v. Pickard*, 100 F. Supp. 3d 981 (E.D. Cal. 2015) (court taking judicial notice of statements made by U.S. Surgeon General on televised interview concerning marijuana's efficacy for medical conditions as part of considering motion to dismiss).

Mr. Daley hereby moves the Court to take judicial notice of the opinion issued by this Court in the case of *Kessler v. City of Charlottesville, Virginia, et al*, 2017 WL 3474071 (WDVA August 11, 2017).  Specifically, Mr. Daley moves the Court to take judicial notice of the following facts and findings as set forth in that opinion:

- "On May 30, 2017, [Jason] Kessler applied for a permit to conduct a demonstration in Emancipation Park ("the Park") in the City of Charlottesville."
- "Kessler intends to voice his opposition to the City's decision to rename the Park, which was previously known as Lee Park, and its plans to remove a statue of Robert E. Lee from the Park."

- "On June 13, 2017, the [City of Charlottesville] granted Kessler a permit to conduct a demonstration on August 12, 2017."

- "In the following weeks, the [City of Charlottesville] granted organizations, which oppose Kessler's message, permits to counter-protect in other public parks a few blocks away from Emancipation Park."

- "On August 7, 2017, less than a week before the long-planned demonstration at the Park, the [City of Charlottesville] notified Kessler by letter that they were 'revoke[ing]' the permit" and "'modif[ying]' the permit to require that the demonstration take place at McIntire Park, which is located more than a mile from Emancipation Park."

- "At the same time, the [City of Charlottesville] took no action to modify or revoke the permits issued to counter-protestors for demonstrations planned within blocks of Emancipation Park."

- "In revoking the permit, the [City of Charlottesville] cited 'safety concerns' associated with the number of people expected to attend Kessler's rally."

- "[T]he [City of Charlottesville] cited no source for those concerns and provided no explanation for why the concerns only resulted in action being taken on Kessler's permit."

- "On August 10, 2017, Jason Kessler filed [an] action under 42 U.S.C. § 1983 against the City of Charlottesville" and "[t]he following morning, he filed [a] motion for preliminary injunctive relief."

- "Based on the current record, the court concludes that Kessler has shown that he will likely prove that the decision to revoke his permit was based on the content of his speech."

- "Kessler's assertion in this regard is supported by the fact that the City solely revoked his permit, but left in place the permits issued to counter-protestors."

- "The disparity in treatment between the two groups with opposing views suggests that the defendants' decision to revoke Kessler's permit was based on the content of his speech rather than other neutral factors that would be equally applicable to Kessler and those protesting against him."

- "The conclusion is bolstered by other evidence, including communications on social media indicating that members of City Council oppose Kessler's political viewpoint."

- "At this stage of the proceedings, the evidence cited by Kessler supports the conclusion that the City's decision constitutes a content-based restriction of speech."

- "Additionally, to the extent the defendants' decision was based on the number of counter-protestors expected to attend Kessler's demonstration, it is undisputed that merely moving Kessler's demonstration to another park will not avoid a clash of ideologies or prevent confrontation between the two groups."

- "As both sides acknowledged during the hearing, critics of Kessler and his beliefs would likely follow him to McIntire Park if his rally is relocated there."

6

- "The court further concludes than an injunction protecting the plaintiff's rights under the First Amendment is in the public interest."

## ARGUMENT

A court must dismiss a charge if it "fail[s] to state an offense." Fed. R. Crim. Pr. 12(b)(3)(B). A charge fails to state an offense when the conduct alleged in the indictment is not a crime, and when the Constitution precludes the prosecution. Where a constitutional challenge to a charge is made on the grounds that the charge conflicts with the First Amendment's guarantees of free thought, belief, and expression, the trial court should subject the legal sufficiency to exacting scrutiny.

The sections that follow demonstrate that each of the two counts of the Indictment fail for multiple reasons, and therefore, the Indictment must be dismissed in its entirety. Each argument on a given count is an independent and sufficient basis for dismissal of that count.

I.  **The Allegations in Count Two Are Insufficient to Establish that the Defendant "Incited," "Promoted," "Encouraged," Participated in" or "Carried on in" a Riot, or that the Defendant "committed acts of violence in furtherance of a riot or Aided and Abetted Others in the Same**

An indictment fails to state an offense if the defendant's alleged conduct is not proscribed by the statute the indictment invokes. *See United States v. Engle*, 676 F.3d 405, 415 (4th Cir. 2012) ("a] district court may dismiss an indictment under Rule 12 'where there is an infirmity of law in the prosecution…'") (internal quotation omitted). The words used in the Indictment must "fully, directly, and expressly, without any uncertainty or ambiguity, set forth all the elements necessary to constitute the offence." *Hamling v. United States*, 418 U.S. 87, 117 (1974). To provide this clarity to the defendant, "simply parroting the language of the statute in the indictment is insufficient." *United States v. Brandon*, 298 F.3d 307, 310 (4th Cir. 2002). The statutory language "must be accompanied with such a statement of the facts and circumstances as

7

will inform the accused of the specific offence . . . with which he is charged." *Hamling*, 418 U.S. at 117-18 (internal quotation marks omitted). The indictment must contain a "statement of the essential facts constituting the offense charged." Fed. R. Crim. P. 7(c)(1); *Brandon*, 298 F.3d at 310.

The allegations in the Indictment plainly fail to inform Mr. Daley of the offense with which he is charged. The definition of riot from 18 U.S.C. § 2102(a) states that "riot":

> means a public disturbance involving (1) an act or acts of violence by one or more persons part of an assemblage of three or more persons, which act or acts shall constitute a clear and present danger of, or shall result in, damage or injury to the property of any other person or to the person of any other individual or (2) a threat or threats of the commission of an act or acts of violence by one or more persons part of an assemblage of three or more persons having, individually or collectively, the ability of immediate execution of such threat or threats, where the performance of the threatened act or acts of violence would constitute a clear and present danger of, or would result in, damage or injury to the property of any other person or to the person of any other individuals.

At the most basic level, the Indictment does not even attempt to identify contours of the "riot" that is alleged to be at the heart of these charges. Was there one riot that spanned the entire August 11-12, 2017 weekend? Or were there two separate riots – one on August 11, 2017 and then a second riot on August 12, 2017. When did those riots begin and end? Who participated? The protestors and counter-protesters? Those with a permit to be in Emancipation Park and those without a permit? Or was there not a riot at all but just an attempt to riot?

A riot requires either "an act or acts of violence" and not just any acts of violence, but those that constitute a "clear and present danger" or "shall result in [] damage or injury" to the person or property of another, or threats that such acts will be committed by people "part of an assemblage of three or more persons" who have the ability to actually execute the threat. Yet, the Indictment lacks any specific facts and instead improperly relies on mere blanket recitations of the statutory language. The only specific allegations concerning violence in the entire

8

Indictment are that on August 11, 2017 "[v]iolence ensued" (Indictment ¶ 2), and that on August 12, 2017, "[a]fter several instances of violence prior to the scheduled start of the rally, law enforcement declared an 'unlawful assembly' and required rally participants to disperse." The general referenced to violence are not tied to the amorphous "riot" or to Mr. Daley. In fact, there is not even the suggestion that Mr. Daley hit anyone, told someone else to hit anyone, or that anything he did actually promoted or was related to any acts of violence - except where the Indictment recites the statutory language by rote.

More specifically, the Indictment lacks allegations to bring it under any specific subsection of 18 U.S.C. § 2101.

No Allegations of Inciting a Riot. The word "incite" means "[e]ncourage or stir up (violent or unlawful behavior); [u]rge or persuade (someone) to act in a violent or unlawful way." *Incite*, English Oxford Living Dictionaries',

https://en.oxforddictionaries.com/definition/incite (last visited January 21, 2019); *see also Incite*, *Black's Law Dictionary* (10th ed. 2014) ("To provoke or stir up (someone to commit a criminal act, or the criminal act itself)."). None of the factual allegations establish that Mr. Daley did or said anything to "stir up," "encourage," "provoke" or "try earnestly or persistently to persuade" other individuals to engage in a riot.

No Allegations of Organizing, Promoting or Encouraging a Riot. Likewise, the indictment lacks any factual allegations that Mr. Daley organized the alleged riot, promoted the alleged riot, or encouraged the alleged riot. The indictment lacks any mention of communications from Mr. Daley whatsoever that concern the alleged riot.

No Allegations of Participating in or Carrying on In a Riot. Without specifically identifying any riot, the Indictment also fails to sufficiently allege that Mr. Daley participated in or carried on in a riot.

No Allegations of Traveling with the Specific Intent to Participate in or Carry on in a Riot. The Indictment fails to sufficiently allege that Mr. Daley had the requisite intent when he traveled. In fact, the indictment alleges that Daley and the others traveled to political rallies in California and Virginia "*where* they prepared to and engaged in acts of violence." The only allegation is therefore that they "prepared" after they traveled. The most generous reading is that Mr. Daley traveled, and participated in political rallies, but not that he traveled *with* the requisite intent. *See United States v. Gallo*, 782 F.2d 1191, 1194 (4th Cir. 1986) (reversing a Travel Act conviction).

No Allegations of Aiding or Abetting Any of the Above. There are likewise no specific factual allegations to support that Mr. Daley aided or abetted anyone else in any of the above referenced activities.

## II.    Count Two Violates the First, Fifth, and Sixth Amendments

Even if the factual allegations in Count Two were held to establish that Mr. Daley traveled with the intent to incite a riot, Count Two suffers from fatal constitutional flaws: it seeks to punish defendants for engaging in protected First Amendment freedoms of speech and peaceable assembly. As Judge Fairchild of the Seventh Circuit identified 40 years ago in one of the only significant prosecutions under this statute, the Federal Anti-Riot Act "operates in an area where there is substantial potential for abridgment of expression." *Dellinger*, 472 F.2d at 355. Consequently, the Act deserves "careful consideration." *Id.*

The Federal Anti-Riot Act touches on two First Amendment protections: freedom of

Case 3:18-cr-00025-NKM-JCH   Document 72   Filed 02/01/19   Page 10 of 26   Pageid#: 412

speech and freedom of assembly. The court should be mindful to protect the speech itself and the assembly, by protecting the speech that makes the call to assemble. A call to assemble is central to the political process by providing a forum for public discussion outside traditional political structures. In its current iteration, the Act is overbroad and fails to meet the standard for criminalizing incitement. The Act is also vague. Consequently, Count Two must be dismissed.

## A. 18 U.S.C. § 2101 is Facially Unconstitutional

### a. The Federal Anti-Riot Act is Void for Vagueness

The Anti-Riot Act is unconstitutionally vague. A statute is void for vagueness "if its prohibitions are not clearly defined." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). The Anti-Riot Act fails to give citizens reasonable notice of prohibited conduct and fails to provide explicit standards for law enforcement and prosecution. "As generally stated, the void-for-vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *Kolender v. Lawson*, 461 U.S. 352, 357 (1983).

The standard for determining vagueness is whether "men of common intelligence must necessarily guess at its meaning." *Broadrick v. Oklahoma*, 413 U.S. 601, 607 (1973). Here 18 U.S.C. § 2101 is void for vagueness, because the law fails to set forth adequate standards to guide the judge or the jury in its determination of guilt. There are at least three sources of indeterminacy in this statute, both of which are compounded by the statute's infrequent application. The combination of these factors "makes a task for us which at best could be only guesswork." *United States v. Evans*, 333 U.S. 483, 495 (1948).

The first source of indeterminacy in 18 U.S.C. § 2101 involves the definition of the term

"riot." The Act defines riot as assembly of three or more people that creates a "public disturbance" involving "an act or acts of violence" or "a threat or threats of the commission of an act or acts of violence by one or more persons . . . having . . . the ability of immediate execution of such threats, where the performance of the threatened act or acts of violence would constitute a clear and present danger of, or would result in damage or injury." 18 U.S.C. § 2102 (a).

There is some conduct that squarely falls within the provision's grasp, such as assemblies that create violent and unlawful public disturbances. However, where the conduct merely constitutes a "threat of the commission of an act or acts of violence," conduct that constitutes a threat of violence that can be immediately executed is neither adequately defined nor does the case law provide a principled and objective standard to resolve its indeterminacy. Rather, the determination of whether an act constitutes a threat of violence requires inquiry beyond the elements of the crime. That is, it requires an abstract assessment of chance: whether the person threatening the commission of an act of violence can carry out the threat. Like "assessing 'potential risk'," assessing the ability to execute a threat, requires abstraction and leaves uncertainty about the standard. The Supreme Court has recently found several statutes requiring similar risk assessments to be unconstitutionally vague. *See Johnson v. United States*, 576 U.S. __, 135 S. Ct. 2551 (2015) (ruling residual clause of Armed Career Criminal Act unconstitutionally vague); *Sessions v. Dimaya*, 584 U.S. __, 138 S. Ct. 1204 (2018) (part of 18 U.S.C. §16(b) that defined violent felony was unconstitutionally vague).

The second source of indeterminacy in 18 U.S.C. § 2101 involves the term "to incite a riot," or "to organize, promote, encourage, participate in, or carry on a riot." 18 U.S.C. § 2102(b). The Anti-Riot Act punishes language and expressive conduct which intentionally incites a "riot." This standard is subjective, and impossible to define from the standards set forth

12

in the statute or the standards in the case law. There is a right to incite anger at social conditions and government policies, but the distinction between inciting dissatisfaction and anger can only be drawn with the benefit of hindsight. That is, the distinction depends on the state of mind of the audience; a distinction impossible to draw. Even if the court finds that this distinction is sufficiently drawn, 18 U.S.C. § 2101 fails to give sufficient guidance about the sort of conduct and the sort of speech that constitutes incitement. Although incitement "shall not be deemed to mean the mere oral or written (1) advocacy of ideas or (2) expression of belief, not involving advocacy of any act or acts of violence or assertion of the rightness of, or the right to commit, any such acts," 18 U.S.C. § 2102(b), this standard fails to give speakers clear guidance about the forcefulness with which they can advocate for their views before their expression falls within the purview of the statute.

Further, the statute's purported jurisdictional hook as alleged in the Indictment is "travel in interstate commerce" with the requisite intent. However, the intent is required only at the moment of travel (or use of interstate instrumentalities), and not at the time of any subsequent overt acts. The language of the statute allows the requisite criminal intent (evidenced by one act or a set of acts) to be frozen at the moment of interstate travel or use, and to then infect any subsequent actions that could be committed without the specific criminal intent. The attenuation between the *mens rea* and the *actus reus* means there is no fair warning and clearly discernable standard for application and adjudication, creating due process concerns. The individual must avoid inflammatory words no matter how far removed from a riot situation, or speak at his peril. "The bare convergence of evil intent and subsequent disorder can make acts of protected expression criminal." *The Federal Riot Act and the First Amendment,* 5 Harv. C.R.-C.L. L. Rev.

13

393 (1970).  This increases the opportunities for abuse of prosecutorial discretion and danger of hostility toward unpopular views, creating a significant chilling effect on speech.

The Federal Anti-Riot Act requires that a person of ordinary intelligence guess what is and what is not prohibited under the statute. Consequently, the Act is unconstitutionally vague and violates due process so Count Two must be dismissed.

### b.  *The Federal Anti-Riot Act is Unconstitutionally Overbroad*

The Federal Anti-Riot Act must be struck down as facially overbroad. When the First Amendment is implicated, "a statute is overbroad because it is unclear whether it regulates a substantial amount of protected speech." *United States v. Williams*, 553 U.S. 285, 304 (2008). The Fourth Circuit has articulated that the overbreadth doctrine applies when the substantial interest the government seeks to achieve "could be achieved by less drastic means -- that is, [by] a method less invasive of free speech interests." *United States v. Morison*, 884 F.2d 1057, 1075 (4th Cir. 1988). The Anti-Riot Act aims at the maintenance of public order, however the means chosen to achieve that end do not provide "adequate breathing space" for the freedoms protected by the First Amendment.  *Boos v. Barry*, 485 U.S. 312, 322 (1988).

The expressive conduct which 18 U.S.C. § 2101 chills warrants First Amendment Protection. The act impermissibly infringes on freedom of assembly. It equates organized assemblies with organized violence. The right to assemble for the "expression [of] public issues has always rested on the highest rung of the hierarchy of First Amendment Values."  *NAACP v. Claiborne*, 458 U.S. 886, 913 (1982).  The line between peaceful assembly and violent behavior is not clearly drawn in the statute, and there remains an important amount of disruptive assemblies that, although protected, come within the purview of 18 U.S.C. § 2101.  Second, the act impermissibly infringes on freedom of speech.

14

Furthermore, endorsing the prosecution of political protest would deter and discourage such expressive conduct. The overbreadth doctrine seeks to prevent the "deter[ence] or chill[ing] [of] constitutionally protected speech – especially when the overbroad statute imposes criminal sanctions." *Virginia v. Hicks*, 539 U.S. 113, 119 (2003) (citation omitted). Consequently, the Anti-Riot Act would be overbroad if applied to expressive conduct arising from a political demonstration, no matter how offensive or intolerant the expressive conduct is.

The Anti-Riot Act fails to spell out the appropriate guidelines of constitutionally protected conduct. Consequently, 18 U.S.C. § 2101 regulates a substantial amount of protected First Amendment expressive activity and must be struck down as unconstitutional. This requires dismissal of Count Two.

> c.  *The Federal Anti-Riot Act Does Not Satisfy the Stringent First Amendment Requirements for Criminalizing Incitement*

The Anti-Riot Act fails to meet the First Amendment standard governing incitement because it "sweeps within its condemnation speech with our Constitution has immunized from governmental control." *Brandenburg v. Ohio*, 395 U.S. 444, 448 (1969). The statutory scheme creates questions of whether conduct the Act outlaws can be "distinguished from what is constitutionally protected speech." *Watts v. United State*s, 394 U.S. 705, 707 (1969). Constitutional guarantees of free speech do not allow the government to proscribe advocacy of the use of force or illegality unless such advocacy is directed at inciting or producing imminent lawless action and is likely to produce such action. *Brandenburg*, 395 U.S. at 448.

To satisfy the standard for incitement, the expressive conduct (1) must be directed at specific individuals, *Hess v. Indiana*, 414 U.S. 105, 109-09 (1973), (ii) must "specifically advocate for listeners to take . . . action," *Bible Believers v. Wayne Cnty.*, 805 F.3d 228, 244-46 (6th Cir. 2015) (quoting *Hess* 414 U.S. at 109); (iii) must be uttered with the specific intent "to

15

produce . . . imminent disorder, *Hess*, at 109; and (iv) the action must be likely to occur. *Brandenburg*, 395 U.S. at 448. Incitement to riot is not defined under the Anti-Riot Act, but it is limited to exclude "the mere oral or written [ ] advocacy of ideas or [ ] expression of belief, not involving advocacy of any act or acts of violence or assertion of the rightness of, or the right to commit, any act or such acts." 18 USC § 2101(b).

The Riot Act fails to make the distinction set out in *Brandenburg*. *Bradenburg* reaffirmed that "the mere abstract teaching . . . of the moral propriety or even moral necessity for a resort to force and violence is not the same as preparing a group for violent action . . . .A statute which fails to draw this distinction impermissibly intrudes upon the freedoms guaranteed by the First and Fourteenth Amendments …. [A criminal act may not be defined in terms of] mere advocacy not distinguished from incitement to imminent lawless action." 395 U.S. at 560. Sections 2102(b) (1)-(2) state that prohibited activities shall *not* be deemed to mean "(1) advocacy of ideas or (2) expression of belief, *not involving advocacy of any act or acts of violence or assertion of the rightness of, or the right to commit, any such act or acts."* (emphasis added).

The Act's definition of incitement to riot has been understood to "punish speech only when a sufficiently close relationship between such speech and violent action is found to exist." *Dellinger*, 472 U.S. at 360. Nevertheless, the Anti-Riot Act does not operate within the constitutional limits of incitement. The Act does not define riot exclusively as violence and illegality, rather, it includes in the definition of riot the threat of force or illegality, when the threat can be carried out or performed. *See* 18 U.S.C. § 2102 (a). Consequently, rather than punishing the advocacy of violence that creates a likelihood of imminent actual harm, the Anti-Riot Act punishes a speaker for creating a likelihood of a *threat of conduct* that itself in turn

creates a risk or danger of harm. This scheme creates an attenuation problem that punishes speech and expressive conduct when the harm threatened is not imminent and is remote from the speech itself.

The Supreme Court has taken notice of attenuation as a problem in the context of the First Amendment. *See N.A.A.C.P. v. Claiborne Hardware Co.*, 459 U.S. 886, 928-29 (1982). For example, speech can be so attenuated from concerted acts of violence, that such acts of violence can occur "weeks or months" after an emotionally charged speech. *Id.* The Northern District of California has attempted to deal with the attenuation problem by reasoning that "[i]f the disturbances promoted or threatened constitute a clear and present danger, the overt acts themselves which are committed for that purpose, necessarily must also constitute a clear and present danger." *In re Shead*, 302 F. Supp. 560, 565 (N.D.Cal. 1969). However, this construction still fails constitutional muster. Banning the incitement of acts of violence that in turn create the clear and present *threat* of damage is not equivalent to banning the incitement of imminent and likely violence. The Anti-Riot Act does not limit violations to those situations in which the interdicted conduct presents a clear and present danger of actual injury

The Anti-Riot Act is uniquely concerned with the quality of words themselves – not as they relate to actual or unambiguous imminent danger, but to ambivalent situations of potential harm that may or may not ever occur. No proximity requirement between the intent or overt acts and the riotous acts which may or may not follow later. To suggest all expressive acts committed for the purpose of incitement actually constitute such a danger is to render the traditional distinction between advocacy of ideas and strict incitement meaningless. When "every idea is an incitement," the process by which courts distinguish between intent to cause likely imminent danger becomes meaningless. *Gitlow v. New York*, 268 U.S. 652, 673 (1925).

17

The Anti-Riot Act pushes even further because, unlike incitement, "promotion" or "encouragement" or "organization" are acts that do not intrinsically suggest an imminent causal relationship to their possible consequences. The failure to attach the clear and present danger requirement to these activities creates a third removal from actual violent conduct.

But the Riot Act proscribes activities a fourth step away from violent conduct – by punishing travel or use of interstate facilities *with intent* to incite, promote, or encourage a riot. The attenuated nexus between intent and harm means there is no fair warning and clearly discernable standard for application and adjudication, creating due process concerns as noted above. It would mean that the speaker in *Brandenburg* could not be punished for advocating for violence, but he could be punished for traveling with the intent to advocate for the same.

Because the Anti-Riot Act punishes speech that incites the threat of action, rather than speech that specifically advocates that listeners engage in imminent violent action, the Act's prohibitions are so attenuated from the imminent and actual harm required by *Brandenburg* as to be unconstitutional. The "mere tendency of speech to encourage unlawful acts" is not sufficient reason for banning it. *Bible Believers*, at 245 (quoting *Ashcroft v. Free Speech Coal*, 535 U.S. 234, 253 (2002)). Count Two must be dismissed.

**B. 18 U.S.C. § 2101 is Unconstitutional As Applied to this Case**

The First Amendment precludes 18 U.S.C. § 2101 from applying to disorders arising from political demonstrations like the one Mr. Daley attended in Charlottesville. Congress enacted the Federal Anti-Riot Act as a rider bill to the Civil Rights Act of 1968. Pub. L. 90-284, 82 Stat. 75, enacted April 11, 1968. Congress' main concern with passing the bill was the social unrest in the nation's cities after the assassination of Dr. Martin Luther King, Jr. Just a few months prior to the Federal Anti-Riot Act, Congress had enacted the D.C. Riot Act in late

December 1967, *see* Pub. L. 90-226 § 901, 81 Stat. 734, 742 (Dec. 27, 1967) (codified as amended at D.C. Code § 22-1322), "to enable the law enforcement authorities to handle future riotous situations in the District of Columbia similar to those which had afflicted cities such as Newark and Detroit the summer before." *United States v. Matthews*, 419 F.2d 1177, 1181 (D.C. Cir. 1969).

Both Acts faced early constitutional challenges. To avoid such challenges, the D.C. Circuit specifically interpreted the D.C. Riot Act as not applying to "disorders" arising from political demonstrations, which is how the Government seeks to apply the Act against Mr. Daley. *Matthews*, 419 F.2d at 1181. The D.C. Circuit distinguished "mindless, insensate violence" from "demonstrations such as the October 21, 1967, anti-Viet Nam War march." *Id.* at 1182 n. 9. Notably, this was not a peaceful march, ending with the arrest of some 650 protestors and 50 people injured.[1] The *Matthews* Court concluded that any reading of the D.C. Riot Act that failed to exclude disorders related to political demonstrations would "jeopardize the validity of the statute by making it trespass on protected First Amendment rights." *Id.*

In drawing upon that legislative purpose, the D.C. Circuit concluded that the focus of the D.C. Riot Act was the "mindless, insensate violence and destruction unredeemed by any social value and *serving no legitimate need for political expression*." *Id.* at 1182 (emphasis added). The Federal Anti-Riot Act was designed to "supplement, not supplant, local law enforcement." House Judiciary Committee Report, HR 421. It is clear that, neither of these laws were intended to apply to political demonstrations, such as those protesting the particular policies of the federal, state, or local government.

---

[1] *See., e.g.,* Ben A. Franklin, *War Protesters Defying Deadline Seized in Capital*, N. Y. Times, Oct. 23, 1967, at 1.

Here, the events in Count Two for which the defendants traveled in interstate commerce from California to Charlottesville, took place for the purposes of protesting the decision of Charlottesville City Council to order removal of Confederate monuments and memorials from public spaces and promoting white supremacism. In fact, this Court recognized the political purpose of protesting the removal of Confederate monuments when it enjoined Charlottesville City Council from requiring that the event occur in McIntire Park. Judge Conrad asserted that the City's decision to remove the Robert E. Lee statue, located in Emancipation Park, was the primary reason for the Unite the Right Rally. *Kessler v. Charlottesville et. al*, 2017 WL 3474071 (WDVA August 11, 2017).

As applied to Mr. Daley, § 2101 also cannot pass the test for incitement. The standard for incitement is an intent-imminence-likelihood test – the advocacy must be "directed to inciting or producing imminent lawless action and be likely to produce such action" *Brandenburg*, 395 U.S. at 443. There are no allegations that Mr. Daley's subjective intent was to incite a riot other than a statement copying the elements of the statute. In fact, information from this Court's decision in *Kessler* shows that the United the Rally was a permitted demonstration about removal of a statute. Even if the speech at the rallies were advocating force or violence, there is no allegation that Mr. Daley "prepared a group for violent action and steel[ed] it to such action." *Brandenburg*, 395 U.S. at 444. The Indictment fails to meet the constitutional test for incitement and must be dismissed.

### C. The Anti-Riot Act Exceeds Congress's Commerce Clause Authority

To obtain a conviction under the Anti-Riot Act, the Government must prove that a defendant travelled in interstate commerce or used a facility of interstate commerce. Mr. Daley is alleged to have to have violated the Anti-Riot Act by traveling in interstate commerce. Mr.

Daley acknowledges that existing precedent affirms "travel with intent" statutes as valid constructions of commerce clause authority, but asks this Court to reconsider the propriety of the jurisdictional hook in a case such as this where the regulated conduct is local in nature.

The Constitution purposefully withheld a general police power from Congress to prevent a "plenary police power that would authorize enactment of every type of legislation." *United States v. Lopez,* 514 U.S. 549, 566 (1995); *see also United States v. Comstock*, 560 U.S. 126 (2010). The Constitution intentionally did not grant a national police power and instead left it to the states, to ensure individual's rights would be protected. *New York v. United States,* 505 U.S. 144, 181 (1992). This system of federalism is meant to insulate states from the will of the Federal government so they may "function as political entities in their own right." *Bond v. United States*, 564 U.S. 211, 221 (2011). Further, federalism "protects the liberty of the individual from arbitrary power." *Id*.at 222.

As the Supreme Court has noted "a criminal act committed wholly within a State cannot be made an offence against the United State unless it have some relation to the execution of a power of congress." *Bond v. United States*, 572 U.S. 844, 854 (2014); *see also United States v. Fox*, 95 U.S. 670, 672 (1878). The Anti-Riot Act's inclusion of "whoever travels in interstate or foreign commerce or uses any facility of foreign commerce" hook fails to bring this statute under the Commerce Clause power of Congress. The Anti-Riot Act encroaches on the State's police power to bring assault and/or battery charges, improperly converting these core state functions into federal crime by the happenstance of travel.

Like the statute at issue in *Lopez*, the Anti-Riot Act "has nothing to do with 'commerce' or any sort of economic enterprise, however broadly one might define those terms." 514 U.S. at 562. There, the Court held that the Gun-Free School Zones act, prohibiting firearms on public

school campus, was not substantially related to commerce and was thus unconstitutional. In reaching its decision the Court found that the statute was "not an essential part of a larger regulation of economic activity" and therefore did not substantially affect interstate commerce. *Id.*

The alleged conduct in the present indictment would not reach the necessary threshold to "substantially affect" interstate commerce. Only when the "economic activity affects interstate commerce, legislation regulating that activity will be sustained." *Id.* at 560. To accept the overreaching of the commerce clause power in § 2101 "would dramatically intrude upon traditional state criminal jurisdiction" *Bond*, 572 U.S. 844, (2014); *United States v. Bass*, 404 U.S. 336 (1971). The State of Virginia is fully capable of pursuing action against Mr. Daley if it so chose to do so.

This Court should dismiss Count Two as in excess of Congress's Commerce Clause authority and the Tenth Amendment because the law seeks to punish inherently local activity.

### III. <u>Count One Violates the First, Fifth, and Sixth Amendments</u>

#### A. Because Engaging in a Riot Requires the Participation of 3 or More People, Wharton's Rule Proscribes the Charge of Conspiracy to Engage in a Riot

Wharton's Rule bars a separate conspiracy charge where the underlying crime requires collective action. Here, Mr. Daley and his co-defendants have been charged with conspiracy to "commit a crime against the United States," which, by statute, already requires "two or more persons." 18 U.S.C. § 371.

Wharton's Rule is an exception to the general rule that a conspiracy to commit a substantive offense is a discrete crime from the substantive offense itself. *Iannelli v. United States*, 420 U.S. 770, 781–82 (1975). Under Wharton's Rule, an agreement between multiple people to commit a crime cannot be prosecuted as a conspiracy when multiple people are

necessary to commit the substantive offense. *Gebardi v. United States*, 287 U.S. 112, 121–22 (1932).

> In determining whether Wharton's Rule applies, courts examine three criteria:
>
> > [(1)] The parties to the agreement are the only persons who participate in commission of the substantive offense, [(2)] the immediate consequences of the crime rest on the parties themselves rather than on society at large… [and (3)] the agreement that attends the substantive offense does not appear likely to pose the distinct kinds of threats to society the law of conspiracy seeks to avert.

*Iannelli*, 420 U.S. at 783–84 (internal citations and footnotes omitted).

> Rather than rigidly applying these criteria, courts take a functional view and apply Wharton's Rule whenever "[t]he substantive offense… presents some of the same threats that the law of conspiracy normally is thought to guard against, and it cannot automatically be assumed that the Legislature intended the conspiracy and the substantive offense to remain as discrete crimes upon consummation of the latter." *Id*. at 785. The Supreme Court held that a federal gambling statute, 18 U.S.C. § 1955, did not qualify for Wharton's Rule because "the… definition of 'gambling activities' pointedly avoids reference to conspiracy or to agreement, the essential element of conspiracy." *Iannelli*, 420 U.S. at 789 ("in light of the numerous references to conspiracies throughout the extensive consideration of the Organized Crime Control Act, we think that the limited congressional definition of 'gambling activities' in § 1955 is significant. [Congress] chose … to define the substantive offense punished by § 1955 in a manner that fails specifically to invoke the concerns which underlie the law of conspiracy.")

> The statute in this case is markedly different. The Anti-Riot Act is animated by exactly the same purpose as the law of conspiracy. 18 U.S.C. § 2102 defines a riot as a "public disturbance involving… an assemblage of three or more persons" which damage person or property, create a clear and present danger to that effect, or threaten to do such. This definition

23

contemplates the concerted action of "three or more persons." As such, the substantive offense of the Anti-Riot Act concerns the same group conduct that the law of conspiracy seeks to avert. Therefore, Wharton's Rule bars Count One.

### B. The Allegations in Count One are Insufficient to Establish that Mr. Daley was the Member of an Illegal Agreement

To obtain a conviction on the charge of conspiracy, the Government must prove that two or more persons agreed to do something, that the Defendant knew of the conspiracy and willfully joined, and that one of the members of the conspiracy knowingly performed one of the overt acts charged in the indictment in order to accomplish the purposed of the agreement. Although the Indictment describes in detail the "overt acts" allegedly committed by members of the conspiracy, it does not allege sufficient facts to establish that Mr. Daley knowingly and voluntarily participated in an *agreement* with the intent to commit a criminal objective.

It is not enough to allege that Mr. Daley traveled to and stayed in Charlottesville, purchased athletic tape and baseball helmets, and attended a rally on the evening of August 11, 2017 and the Unite the Right Rally on August 12, 2017. Furthermore, alleged membership in RAM and presence at other rallies simply does not support an inference, let alone a conclusion, that there was an *agreement* to do anything. As set forth above, no "riot" is ever identified in the indictment. Moreover, the Indictment alleges that the conspiracy began in March 2017, but we are left to guess at when or how the specific agreement to travel with the intent to riot was formed. Particularly considering that the overt acts alleged were the *intrastate* attending of rallies within California on March 25 and on April 15 four months before Unite the Right Rally.

Accordingly, the facts alleged in Count One are insufficient to establish 18 U.S.C. § 371.

### C.  Count One Violates the First, Fifth, and Sixth Amendments

#### a.  Count One is Unconstitutionally Vague, Overbroad, and Lacking Specificity as to Mr. Daley

Count One is unconstitutionally vague, overbroad, and lacking in specificity for the same

reasons as Count Two, *see* Section I and IIA, *supra*, as Count One charges a conspiracy whose

object is the unconstitutionally vague charge in Count Two. Therefore, it must be dismissed.

#### b.  The First Amendment Precludes the Charge of Conspiracy to violate 18 U.S.C. § 2101 from Applying to Disorders Arising from Political Demonstrations

Count One charges Mr. Daley with conspiracy to travel with intent to riot. Because the

First Amendment protects political speech like the speech Mr. Daley engaged in on August 11

and 12, 2017, *see* Section IIB, *supra*, it necessarily precludes a charge of conspiracy to engage in

that speech. Count One must be dismissed.

Respectfully submitted,

BENJAMIN DALEY

By Counsel

Counsel:
/s Lisa M. Lorish
Lisa M. Lorish (VSB No. 81465)
Assistant Federal Public Defender
Office of the Federal Public Defender
401 E. Market St, Ste 106
Charlottesville, VA 22902
Tel (434) 220-3380

Frederick T. Heblich, Jr. (VSB 21898)
Assistant Federal Public Defender
Office of the Federal Public Defender
401 E. Market Street, Ste. 106
Charlottesville, VA 22902
Tel. (434) 220-3386

**CERTIFICATE OF SERVICE**

I hereby certify that on February 1, 2019, I electronically filed the foregoing with the Clerk of

the Court using the CM/ECF system which will send notification of such filing to the following:

counsel of record; and I hereby certify that I have mailed by United States Postal Service the

document to the following non-CM/ECF participants: none.

> s/ Lisa M. Lorish
> Asst. Federal Public Defender