**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
CHARLOTTESVILLE DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | |
| | ) | **Case No. 3:18-cr-25** |
| BENJAMIN DALEY | ) | |
| | ) | |
| Defendant. | ) | |

## REPLY IN SUPPORT OF MOTION TO DISMISS THE INDICTMENT

Mr. Daley submits the following reply in support of his motion to dismiss the indictment

on the grounds that (1) the indictment fails to state an offense as required by Fed. R. Crim. P. 12

and 7, and (2) the statute that is the basis of the prosecution, the Federal Anti-Riot Act, 18 U.S.C.

§ 2101, is unconstitutional.  The Government has filed a response ("Opp. Br.") in opposition to

this motion.  ECF 79.  In that opposition, the Government misconstrues the Anti-Riot Act as a

statute that focuses only on violence, not speech, and also includes pages of new facts (not

pleaded in the Indictment) while claiming that the Indictment needs no amendment.  The

Government asks this Court *to be the first court in 45 years* to uphold the constitutionality of a

law that was intended to target political protestors so that it can federally prosecute Mr. Daley for

what amounts to simple assault.  This Court should decline that invitation.

The Government does not provide any history of the legislation for the Court, nor does it

contest the history provided by Mr. Daley.  The Federal Anti-Riot Act was passed in 1968 as part

of the Civil Rights Act to give the federal government a tool to respond to Vietnam war protests

and civil unrest.  The Government's opposition cited to a total of four cases upholding the

constitutionality of the law, although it admits that two of the four are related.  *See United States

v. Dellinger*, 472 F.2d 340 (1972) (upholding constitutionality of act but nonetheless overturning

Case 3:18-cr-00025-NKM-JCH   Document 87   Filed 03/27/19   Page 1 of 23   Pageid#: 471

convictions of protesters during 1968 Democratic National Convention); *Nat'l Mobilization Comm. To End War in Viet Nam v. Foran*, 411 F.2d 934, 938 (7th Cir. 1969) (declaratory judgment about Anti-Riot Act related to *Dellinger*); *In re Shead*, 302 F. Supp. 560, 565 (N.D. Cal. 1969) (upholding constitutionality of act in declaratory judgment brought by Black Liberation Movement), aff'd on other grounds in *Carter v. United States*, 417 F.2d 384 (9th Cir. 1969); and *United States v. Hoffman*, 334 F. Supp. 504, 509 (D.D.C. Nov. 23, 1971). The Government's brief does not mention any prosecutions under the Act in the intervening 45 years, for good reason. This Court should find that the Indictment failed to properly plead the elements of the offenses charged, and also that the Anti-Riot Act is unconstitutionally vague and unconstitutionally overbroad on its face.

## I.     The Indictment Fails to State an Offense

In his motion to dismiss, Daley argues that both counts of the indictment are defective for two reasons: (1) they fail to allege all of the essential elements of each offense; and (2) they fail to allege a sufficient factual basis to support the prosecution. The Government's response relies on (1) paring down the number of elements that constitute the offense ("Defendants are each charged with violating the Anti-Riot Act of 1968, which, at the most basic level, consists of two simple elements. . . ."), Opp. Br. at p. 8, and (2) supplementing the allegations in the indictment with the expected "facts at trial" to provide a factual basis to support the prosecution. Opp. Br. at p.2. Neither argument is sufficient to overcome the deficiencies in the indictment.

### A.  *Count One Fails To Adequately Allege the Elements of a Conspiracy Offense*

A valid indictment for conspiracy under 18 U.S.C § 371 must allege an agreement to commit a crime, willing participation by the defendant, that at least one member of the conspiracy knowingly committed at least one overt act, and that the overt act was committed to

Case 3:18-cr-00025-NKM-JCH   Document 87   Filed 03/27/19   Page 2 of 23   Pageid#: 472

further an objective of the conspiracy. *Ocasio v. United States*, 136 S.Ct. 1423, 1428-29 (2016). A conspiracy is not a substantive crime, but an agreement to commit a substantive crime. To be valid the indictment must contain not just the elements of conspiracy, but also the elements of the substantive crime.

In *Kingrea* the defendant was charged under 18 U.S.C. § 371 with conspiring to exhibit "an animal fighting venture" in which any animal was moved in interstate commerce, in violation of 7 U.S.C. § 2156(a)(1). *United States v. Kingrea*, 573 F.3d 186 (4th Cir. 2009). The underling offense, 7 U.S.C. § 2156(1)(1) actually prohibited exhibiting "*an animal in* an animal fighting venture." (emphasis added). The Fourth Circuit rejected the Government's argument that "because it alleged a conspiracy" it "was required only to set forth in the indictment the elements of a conspiracy, which it did, regardless of whether all the elements of the criminal offense forming the object of the conspiracy were included." *Kingrea*, 573 F.3d at 192.

For authority the court looked to *United States v. Hooker,* 481 F.2d 1225, 1226 (4th Cir. 1998), where it vacated a conviction for RICO conspiracy because the indictment omitted an essential element of the RICO offense (interstate commerce), and found no

> significance in the fact that [the conspiracy count] alleges a conspiracy rather than a substantive crime. Although an offense that is the object of a conspiracy need not be delineated in the indictment with the same particularity as a substantive offense, *Wong Tai v. United States*, 273 U.S. 77, 47 S.Ct. 300, 71 L.Ed. 545 (1927), this admonition applies to the statements of fact that 'flesh out' the indictment-not the basic elements of the offense itself. *Nelson v. United States*, 406 F.2d 1136 (10th Cir.1969).

*Kingrea*, 573 F.3d at 192-193.

Count One of the indictment charges that Mr. Daley conspired with his codefendants, and others, to commit a crime against the United States, a violation of 18 U.S.C. § 371. The crime they allegedly agreed to commit was a violation of the Federal Anti-Riot Act, 18 U.S.C. § 2101 –

3

however, Count One fails to allege any of the elements of the Anti-Riot offense. In addition, Count One fails for the reasons Count Two fails, as set forth below.

### B. *The Indictment Fails to Sufficiently Allege Violation of the Anti-Riot Act*

Although the Indictment tracks the statutory language of 18 U.S.C. § 2101, containing allegations including the terms "riot," "to incite a riot," and "to organize, promote, encourage, participate in, or carry on in a riot," it omits the definitions of those terms that are contained in 18 U.S.C. § 2102(a) and (b).

> . . . the term "riot" means a public disturbance involving (1) an act or acts of violence by one or more persons part of an assemblage of three or more persons, which act or acts shall constitute a clear and present danger of, or shall result in, damage or injury to the property of any other person or to the person of any other individual or (2) a threat or threats of the commission of an act or acts of violence by one or more persons part of an assemblage of three or more persons having, individually or collectively, the ability of immediate execution of such threat or threats, where the performance of the threatened act or acts of violence would constitute a clear and present danger of, or would result in, damage or injury to the property of any other person or to the person of any other individual.

The statute requires that in order for there to be a "riot," that there must be an "assemblage of three or more persons." *Id.* Nowhere does the Indictment allege an assemblage of three or more persons. The Government responds by citing *United States v. Amend*, 791 F.2d 1120, 1125 (4th Cir. 1986), where the court held that the failure of the indictment to name the five other persons required to establish a continuing criminal enterprise did not invalidate the indictment. However, although the indictment did not *name* the five other persons, it alleged *the existence* of five other persons. Count Two is defective not because it does not name the three persons who constituted the assemblage but because it does not contain the definitional allegation that there was an assemblage of three or more persons and that at least one or more of them committed, or threatened to commit, an act of violence that constituted a clear and present danger of injury or damage, or the factual allegation that there was such an assemblage.

4

The same problem exists with the failure to allege the statutory definitions of "inciting" a riot or "promoting" a riot. The statute defines

> . . . the term "to incite a riot", or "to organize, promote, encourage, participate in, or carry on a riot", includes, but is not limited to, urging or instigating other persons to riot, but shall not be deemed to mean the mere oral or written (1) advocacy of ideas or (2) expression of belief, not involving advocacy of any act or acts of violence or assertion of the rightness of, or the right to commit, any such act or acts.

By omitting the statutory definitions of the operative terms of the offense from the indictment, there is nothing that indicates that the grand jury that issued the indictment was instructed as to all the elements of the offense or actually found probable cause after applying the statutory definitions of the offense. If not instructed as to applicable definitions, the jury would have relied on the common meaning of the terms "riot," "incite a riot," or "promote a riot." The common understanding of "riot" is much broader than the narrowly drawn, technical definition stated in § 2102. For example, the dictionary defines "riot" as "public violence, tumult, or disorder." "riot." *Merriam-Webster.com*. 2019. https://www.merriam-webster.com/dictionary/riot?src=search-dict-box, last accessed March 27, 2019. The definitions of the terms "riot," "incite to riot," etc., are essential elements of the offense, as they specify what conduct is prohibited as well as what conduct is excluded. The definitions would certainly be included as part of the instructions to the jury.

Even if the Indictment had alleged facts that supported the allegation of the existence of a "riot," there are no factual allegations that Mr. Daley "incited" a riot, or "organized, promoted, encouraged, participated in or carried on in a riot" as there are no factual allegations that he "urg[ed] or instigat[ed] other persons to riot." The Government responds that the Indictment is sufficient by pointing to a number of conclusory allegations, devoid of facts, and factual allegations that are irrelevant to the elements of the offense, including:

- Paragraph 13(a) which alleges that on August 11, 2017, Daley and the others incited a riot and committed acts of violence in furtherance of a riot at the torch-lit march at the University of Virginia – *without specifying any actual conduct*.

- Paragraph 13(b) which alleges that on August 12, 2017, Daley and the others incited a riot and committed acts of violence in furtherance of a riot at Emancipation Park at the Unite the Right rally – *without specifying any actual conduct*.

- Paragraph 1 which alleges that in the spring and summer of 2017 the "Unite the Right" rally was organized and scheduled for August 12, 2017, in Charlottesville, and featured white-supremacist speakers – *without directly or indirectly mentioning Daley*.

- Paragraph 2 which alleges that on August 11, 2017, "hundreds of [unidentified] individuals" participated in a torch-lit march on the grounds of the University of Virginia and chanted racist and anti-Semitic views, and "violence ensued" – *without identifying who caused or incited the violence*.

- Paragraph 3 which alleges that on August 12, 2017, "multiple groups and individuals [unidentified] espousing white-supremacist and other anti-Semitic and racist views" arrived at Emancipation Park, and after "several instances of violence," – *none of which are identified* – the crowd was dispersed by law enforcement.

- Paragraphs 4 through 7 which allege that Daley belonged to a white supremacist group in California called "Rise Above Movement" (RAM) and members of the group traveled to "multiple demonstrations in California and Virginia, where they prepared to and engaged in acts of violence against numerous individuals."

Taken together and given a generous reading, the allegations in the Indictment do not provide a factual basis for Count Two. They allege that Mr. Daley belonged to a "white supremacist organization," and that in March and April 2017, he and other members of the group traveled to political rallies in California where there was violence. But it is not alleged that Mr. Daley *incited* the violence that occurred at those rallies, and there are no specific acts of violent conduct attributed to him at those rallies. The Indictment alleges that Mr. Daley traveled to Charlottesville for the purpose of attending the Unite the Right rally, and that he attended the torch-lit march on August 11 and the rally in Emancipation Park on August 12. The Indictment further alleges that he committed "acts of violence in furtherance of a riot" at both events, but no specific conduct is indicated.

6

In fact, the only specific acts attributed to Mr. Daley are that (1) on August 11 he purchased athletic tape and baseball helmets from Wal-Mart, and (2) on August 12 he wrapped his hands with athletic tape. Indictment ¶¶ 10i and 10l.

That the Government may be able to prove additional facts at trial is not a matter to be considered at this stage of the litigation, as the Court may consider only what is alleged in the indictment. If the Government wanted additional facts to be considered at the motion to dismiss phase, they should have provided them to the grand jury the first time, or superseded the Indictment. As it stands, the resort to these extraneous facts only highlights the deficiencies of the original Indictment. Curiously, even with the attempted addition of new facts, the Government's opposition brief still fails to answer the most basic questions – what was the riot, when did it start, and who participated?

**C.  *Judicial Notice is Appropriate***

As set forth in the Motion to Dismiss, this Court should take judicial notice of the findings set forth in this Court's prior opinion in *Kessler v. City of Charlottesville et al*, 2017 WL 3474071 (W.D.Va. August 11, 2017). In opposing judicial notice, the Government does not identify a single fact that is "subject to reasonable dispute" from this Court's prior opinion. The Government's response instead argues that the facts discuss events that occurred "prior to the events alleged in the indictment." Opp. Br. at p. 6. To the contrary, the events alleged in the indictment date back to March 2017, well before the events covered in the *Kessler* opinion.

The Government then generally alleges that the facts found by Judge Conrad are "disputable" and that the opinion "reflects the positions of parties not involved in the present case." Opp. Br. at p. 6. The Government's aversion to specific facts and preference for sweeping statements is consistent with its general posture in this case. Mr. Daley identified 17

7

specific findings from the prior judicial opinion. The Government has not explained why any particular statement is subject to reasonable dispute. In fact, there is no dispute that:

- Jason Kessler applied for a permit on May 30, 2017 to conduct a demonstration in Emancipation Park in the City of Charlottesville
- Kessler intended to voice his opposition to the City's decision to rename the Park
- The City of Charlottesville granted the permit on June 13, 2017 for a demonstration on August 12, 2017
- The City of Charlottesville granted permits to counter-protesters for other public parks a few blocks away from Emancipation Park
- The City of Charlottesville sent Kessler a letter on August 7, 2017 revoking the permit and moving the demonstration to McIntire Park
- The City of Charlottesville did not modify or revoke the permits issued to counter-protesters
- The City of Charlottesville cited safety concerns as the reason to revoke the permit
- The City of Charlottesville did not cite sources for those concerns
- On August 10, 2017, Kessler filed an action challenging the revocation

There is also no dispute that, on the record before it, the Court decided that Kessler showed he would likely prove the decision to revoke was based on the content of his speech. The Court's explanation for its decision, based on the record before it, is also not subject to dispute. Therefore, under Federal Rule of Evidence 201(b) it is proper for this Court to take judicial notice of a prior opinion of this Court.

## II. The Anti-Riot Act Infringes on First Amendment Protected Speech and Assembly

The Government begins its response by proclaiming that "[t]his case is not about free speech or the right to assemble for political purposes." Opp. Br. at 1. But it is about speech. Protected speech is of course not limited to vocal or verbal expression and extends to expression of ideas. "All expression of ideas is effected by, or is, itself, conduct, and all conduct necessarily expresses some idea, emotion, or thought." *Dellinger*, 472 F.2d at 358. The Government's

8

response brief merged the First Amendment challenge with Mr. Daley's overbreadth challenge, and it is certainly true that the First Amendment concerns presented by this statute are closely related to the vagueness and overbreadth of the statute. Mr. Daley nonetheless addresses the First Amendment concerns separately in this section to discuss and distinguish the only significant analysis of the statute previously undertaken, the *Dellinger* case, and to also set forth the appropriate First Amendment test that applies under *Brandenburg v. Ohio*, 395 U.S. 444 (1969).

As an initial matter, the Government in *Dellinger* also argued that their case was not about speech or expression but the Seventh Circuit correctly found that "[w]e are unable to accept this argument." 472 F.2d at 359. This result was compelled, in part, because "rioting, in history and by nature, almost invariably occurs as an expression of political, social, or economic reactions, if not ideas." *Id.* at 359. "The rioting assemblage is usually protesting the policies of a government, an employer, or some other institution, or the social fabric in general…." *Id.* The second reason provided by the Seventh Circuit that the statute concerned speech and expression was that "a riot may well erupt out of an originally peaceful demonstration which many participants intended to maintain as such" and therefore "[e]ach participant is entitled to a careful distinction between responsibility for the lawful and constitutionally protected demonstration and responsibility for the activity for which the legislative body validly prescribes a penalty." *Id.* Finally, the *Dellinger* opinion explained that because many of the Act's provisions related to persons causing the possibility that others will riot, "[I]t is by expression, in whatever form, that causation adequate to bring on punishment must be most likely to occur." *Id.*

While the *Dellinger* court correctly recognized the statute as criminalizing speech, the Seventh Circuit erred by reading into the statute a requirement that the "overt act for any purpose

9

specified" required by the statute must be "equivalent to fulfillment of any purpose specified in (A)-(D)" instead of a "step towards one of the elements of (A)-(D)." *Id.* at 362. In other words, the Seventh Circuit construed the statute to require both travel or use *and* one of the completed actions listed (inciting a riot, organizing a riot, etc). This rewriting of the statute allowed the Seventh Circuit to escape a reading of the statute that it acknowledged would be unconstitutional – punishing travel or use of any instrumentality of commerce (mail, email, phone) with the intent to encourage a riot, and then taking any outward step to actually encourage a riot.

But this is simply not what the text of the statute says, and it is inconsistent with any understanding of what is required for an "overt act". Black's Law Dictionary defines "overt act" as "[a]n outward, physical manifestation of the will performed esp. by a conspirator." (10th ed. 2014). Even with this unabashed rewriting of the statute, the Seventh Circuit still concluded:

> We do not pretend to minimize the first amendment problems presented on the face of this statute. In one hypothetical application, the statute could result in punishment of one who, having traveled interstate, or used the mail, with intent to promote a riot, attempted to make a speech or circulate a handbill for the purpose of encouraging three people to riot. Arguably the statute does not require that the speech, if made, or the handbill, if circulated, succeed in any substantial degree in encouraging the audience to riot. Arguably a frustrated attempt to speak or circulate would not achieve the constitutionally essential relationship with action in any event. Arguably the statute does not require that a speech or handbill succeed in producing a riot or bringing the persons addressed to the brink of a riot, prevented only by some intervening and superseding force, and arguably no less degree of propelling of action by speech or handbill will suffice, even though intent to succeed must also be proved. Although we reject these arguments, in part as constructions of the statute, and in part as grounds for declaring it void, we acknowledge the case is close.

*Dellinger*, 472 F.2d at 362.

This Court cannot change the language of the statute, which fails to meet the Constitutional standard governing incitement. Under *Brandenburg*, there must be <u>intent</u>, <u>imminence</u> to the lawless action, and <u>likelihood</u> that the lawless action actually occurs. 395 U.S.

10

at 448.  The Anti-Riot Act simply does not require imminence or likelihood.  The Government confidently reads a temporal limitation into the statute that simply is not there.  The travel does not need to be linked in time to the rioting.  In fact, the Anti-Riot Act does not require that a riot even occur.  *Dellinger*, 472 F.2d at 361 (contrasting Federal Anti-Riot Act with D.C. Riot Act which does require that a riot actually occur).  Providing further proof that there is an attenuation problem, the Indictment relies on selected events it alleges occurred between March 2017, until August 2017 – a six-month time period.  In contrast, the degree of imminence required to punish speech and expression is "extremely high."  *Bridges v. California*, 314 U.S. 252 (1941).

This Court must reject the Government's bold and unfounded assertion that "Courts have uniformly held that concepts such as incitement, promotion, encouragement, and solicitation to engage in unlawful acts remain categorically outside of First Amendment protection."  Opp. Br. at p. 14. The Government is correct that *solicitation* to engage in a crime is not protected by the First Amendment.  But the Anti-Riot Act does not use the word solicitation.  It says "incite a riot," or "organize, promote, encourage, participate in, or carry on a riot."  18 U.S.C. § 2101.  And "incitement" is excluded from First Amendment protection if it meets the requirements in *Brandenburg*, but that requires that violence be imminent and likely.  As set forth above, the Anti-Riot Act fails to meet this test.

The cases cited by the Government only concern "solicitation" and offers to commit crimes, and do not extend to "promotion," "encouragement," or "incitement" as used in the Anti-Riot Act.  As *United States v. White*, 610 F.3d 956, 960-61 (7th Cir. 2010), cited by the Government, explains, "in the case of a criminal solicitation, the speech-asking another to commit a crime-is the punishable act."  Therefore, "[s]olicitation is an inchoate crime; the crime is complete once the words are spoken with the requisite intent, and no further actions from either the solicitor or the solicitee are necessary."  *Id.*  Likewise, the Supreme Court's decision in

11

*Williams* notes that "*offers to engage* in illegal transactions are categorically excluded from First Amendment protection" in the context of a case about solicitation of child pornography. *United States v. Williams*, 53 U.S. 285, 297 (2008). Finally, the Government points to *Virginia v. Black*, which affirmed the constitutionality of a Virginia statute that banned cross burning "with intent to intimidate" but it did so explaining

> The First Amendment permits Virginia to outlaw cross burnings done with the intent to intimidate because burning a cross is a particularly virulent form of intimidation. Instead of prohibiting all intimidating messages, Virginia may choose to regulate this subset of intimidating messages in light of cross burning's long and pernicious history as a signal of impending violence.

538 U.S. 343, 363 (2003).

None of these cases supports the broad proposition that statements that promote, or encourage others to commit crimes of violence are not protected by the First Amendment. The Government's citation to a single district court decision from 16 years ago that did make such a finding with regard to a different statute than the one that this Court faces, is simply unconvincing, and is likely unconstitutional. *See* Opp. Br. at p. 14-15 citing *United States v. Sattar*, 272 F. Supp. 2d 348, 374 (S.D.N.Y. July 22, 2003).

### III. Defendants Facial Vagueness Challenge is Not Precluded by *Humanitarian Law Project*

The Government's primary response to the vagueness challenge asserted by Mr. Daley is that he cannot lodge a facial challenge for vagueness under the Supreme Court's decision in *Holder v. Humanitarian Law Project*, 561 U.S. 1, 18-19 (2010). In addition, the Government attempts to invoke the rule that "[a] plaintiff who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others." *Humanitarian Law Project*, 561 U.S. at 18-19. The Government's arguments entirely misconstrue and misapply the *Humanitarian Law Project* decision which was <u>not</u> a facial

12

vagueness challenge, but an <u>as applied</u> challenge to a statute. Further, *Humanitarian Law Project* involved prospective conduct, not past conduct.

Regardless, the Indictment does not ascribe conduct to Mr. Daley that "clearly" falls under the ambit of the Anti-Riot Act. It is debatable what conduct is ever "clearly proscribed" by the Anti-Riot Act. The Government is correct that a defendant cannot challenge a statute as vague if his conduct clearly falls within the scope of conduct in the statute – such clarity cures the notice problem at the heart of a vagueness challenge. Where the conduct is not clearly within the scope and falls to the margins, a facial challenge is appropriate. Due process concerns coincide with arbitrary enforcement. The uncertainty with which the Government views the scope of the statute is evidenced in the Indictment itself – many allegations are related to matters in California months before the events in Charlottesville on August 11 and 12, 2017. The same is true with regard to Mr. Daley's conduct – much of the Indictment focuses on the "white-supremacist, racist and anti-Semitic views" allegedly held or expressed by the organization to which the defendants belonged, rather than alleging specific acts of "clearly proscribed" conduct.

It is a mystery how Mr. Daley's conduct could be "clearly proscribed" by the Anti-Riot Act since the Indictment does not even identify what "riot" or "riots" he allegedly incited – or did he simply encourage the riot? Or aid and abet another person in participating in a riot? Was there even a riot? Finally, the mere fact the Government has attempted to offer pages of additional facts not pleaded in the Indictment to support its opposition to the Motion to Dismiss reinforces that Mr. Daley's conduct is not "clearly" covered by the Anti-Riot Act as pled.

Mr. Daley thus challenges the entire statute as facially vague because the entire definition of "riot" is vague. And his conduct is far from "clearly prescribed" under the statute. Furthermore, that requirement has been relaxed "in the First Amendment context, permitting

13

plaintiffs to argue that a statute is overbroad because it is unclear whether it regulates a substantial amount of protected speech." *Williams*, 553 U.S. at 304. Not only is the "clearly prescribed" standard relaxed in a First Amendment case, the Supreme Court has also held that in considering a vagueness challenge

> [P]erhaps the most important factor affecting the clarity that the Constitution demands of a law is whether it threatens to inhibit the exercise of constitutionally protected rights. If for example, the law interferes with the right of free speech or of association, a more stringent vagueness test should apply.

*Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 499 (1982).

 *Williams* considered a facial vagueness challenge, like the one presented in this case. The Supreme Court ultimately disagreed with the Eleventh Circuit's conclusion that the phrases "in a manner that reflects the belief" and "in a manner…that is intended to cause another to believe" rendered the statute unconstitutionally vague because "[w]hat renders a statute vague is not the possibility that it will sometimes be difficult to determine whether the incriminating fact it establishes has been proved; but rather the indeterminacy of precisely what that fact is." 553 U.S. at 305. However, this is the precise problem with the Anti-Riot Act and its definition of "riot." First, the definition of "riot" is replete with indeterminate and subjective terms. This problem is only compounded by the fact that the offense criminalizes travel with the intent to "aid or abet any person in inciting or participating in or carrying on in a riot" and who in the "course of such travel or use or thereafter performs or attempts to perform any other overt act for any purpose specified in…this paragraph." The inclusion of attempted overt acts at any time "during the course of any such travel…or thereafter" with no requirement that the "thereafter" be temporally linked to the travel, adds another level of vagueness.

 Curiously, the Government notes that "Defendants do not voice concern over subsection (a)(1) of 18 U.S.C. § 2102, the conduct at issue in this case…." Opp. Br. at 13. The Indictment

14

did not limit the Government's theory of the case to riots as defined under (a)(1) – involving "an act or acts of violence by one or more persons part of an assemblage of three or more persons, which act or acts shall constitute a clear and present danger of, or shall result in, damage or injury to the property of any other person or to the person of any other individual."  While it may be convenient now for the Government to specify its theory of the case in an effort to escape a vagueness challenge, the Indictment provides no such specificity.  And it is the Indictment that this Court must consider, not the late promise that the Government means to prove a riot under this particular subsection of the definition in 18 U.S.C. § 2102.

To the contrary, the Indictment parrots the statute, alleging that Mr. Daley traveled with intent "(a) to incite a riot, (b) to organize, promote, encourage, participate in, and carry on in a riot, (c) to commit an act of violence in furtherance of a riot, and (d) to aid or abet any person inciting and participating in or carrying on in a riot and committing any act of violence in furtherance of a riot…" and then "performed *or attempted to perform* any other overt act." ECF # 8 at ¶ 13.  The overt acts listed merely copy the statute, alleging on August 11 and August 12 Mr. Daley "incited, promoted, encouraged, participated in, and carried on in a riot, committed acts of violence in furtherance of a riot, and aided and abetted other persons inciting and participating in and carrying on in a riot and committing acts of violence in furtherance of a riot." *Id.* at ¶ 13(a) and (b).  As explained in Mr. Daley's Motion to Dismiss, no riot need ever have even occurred under the statute, so long as a defendant had the requisite intent and some overt act occurred.

What is more, the particular subsection of § 2102 highlighted by the Government is also vague because the definition of "riot" includes a "clear and present danger" requirement.  A vestige of First Amendment law at the time the Anti-Riot Act was passed, the concept of "clear

and present danger" has since been reformed and rejected due to the inherent vagueness of applying that test. By the time of *Brandenburg v. Ohio* in 1969, the majority decision did not use the words "clear and present danger" at all, instead describing the familiar test used today requiring intent, imminence, and likelihood. The concurrence of Justice Douglas explains the history of the "clear and present danger" test and the Supreme Court's previously varying jurisprudence defining when speech creates a clear and present danger. First articulated by Justice Holmes in *Schenck v. United States*, 249 U.S. 47 (1919) as a "question of proximity and degree." By 1925, in his dissent in *Gitlow v. People of State of New York*, 268 U.S. 652 (1925), Justice Holmes expressed that:

> Every idea is an incitement. It offers itself for belief and if believed it is acted on unless some other belief outweighs it or some failure of energy stifles the movement at its birth. The only difference between the expression of an opinion and an incitement in the narrower sense is the speaker's enthusiasm for the result. Eloquence may set fire to reason…

In *Dennis v. United States*, 341 U.S. 494 (1951), the Supreme Court expanded the clear and present danger test, upholding conviction of leaders of the American Communist Party for conspiring to overthrow the United States government. The Court eliminated the imminence requirement and replaced it with a formulation that measured the gravity of harm against its likelihood of occurring. *Id.* This uncertain formulation was replaced entirely by *Brandenburg* which abandoned the words "clear and present danger" instead focusing on the elements of intent, imminence and likelihood. The words appeared again in 1978, in the case of *Landmark Comms., Inc. v. Virginia*, where the Court remarked that the "'clear and present danger' standard "was never intended 'to express a technical legal doctrine or to convey a formula for adjudicating cases.'" 435 U.S. 829, 842 (1978) (quoting *Pennekamp v. Florida*, 328 U.S. 331, 353 (1946) (Frankfurter, J., concurring)). The Court explained that "[p]roperly applied, the test

16

requires a court to make its own inquiry into the imminence and magnitude of the danger said to flow from the particular utterance and then to balance the character of the evil, as well as its likelihood, against the need for free and unfettered expression." *Id.* at 842-43.

The Anti-Riot Act was enacted in 1968, after *Dennis* defined "clear and present danger" as a test that involved weighing the gravity of harm against the likelihood it would occur, and before the Supreme Court's decision in *Brandenburg*. With this history, it is telling that the Government does not address at all the most recent Supreme Court cases concerning vagueness – *Johnson v. United States*, 135 S. Ct. 2551 (2015) (ruling residual clause of Armed Career Criminal Act unconstitutionally vague) or *Sessions v. Dimaya*, 584 U.S. __, 138 S. Ct. 1204 (2018) (ruling part of 18 U.S.C. § 16(b) that defined violent felony was unconstitutionally vague). The residual clause in both statutes was part of the definition of "violent felony" and covered "any crime punishable by imprisonment for a term exceeding one year…that…otherwise involves conduct that presents a serious potential risk of physical injury to another." *Johnson*, 135 S. Ct. at 2555-2556. The two features of the residual clause that conspired to make it unconstitutionally vague were "grave uncertainty about *how to estimate* the risk posed by a crime" as well as "*how much risk* it takes for a crime to qualify as a violent felony." *Id. Johnson* also specifically rejected the Government's argument that the clause could not be unconstitutionally vague because some underlying crimes may clearly pose a serious potential risk of physical injury to another. The Court explained that "If the existence of some clearly unreasonable rates would not save the law in *L. Cohen Grocery,* why should the existence of some clearly risky crimes save the residual clause?" *Id.* at 2561.

The determination of how to estimate risk and how much risk was required for a prior offense to qualify under the Armed Career Act's residual clause is no different than the

assessment the definition of "riot" asks courts to undertake. The Anti-Riot Act requires the court to determine what counts as a "public disturbance" – a term for which there is no definition[1] – as well as what act or threatened act "constitute[s] a clear and present danger of, or shall result in, damage or injury to the property of any other person or to the person of any other individual." As set forth above, the understanding of "clear and present danger" is far from static and easy for a district court to apply. The Court in *Dennis* interpreted "clear and present danger" as requiring court to "ask whether the gravity of the 'evil,' discounted by its improbability, justifies such invasion of free speech as is necessary to avoid the danger." 341 U.S. at 508. And the Supreme Court confirmed years later that the phrase was "never intended 'to express a technical legal doctrine or to convey a formula for adjudicating cases." *Landmark Comms. Inc.,* 435 U.S. at 842.

In considering how a district court must interpret the words in this specific statute, there is no clear answer to how a court should decide what a clear and present danger of injury to person or property looks like – and that is a vagueness problem squarely covered by *Johnson* and *Dimaya*. This is a problem that infects the entire statute, because the definition of "riot" infects the entire statute which is why the entire statute is unconstitutionally vague.

Finally, the Government brushes aside the concern that the Anti-Riot Act is vague because the requisite criminal intent can be present only at the moment of travel, and not at the time of any overt act. In support of its claim that Mr. Daley's reading of the statute is "simply incorrect," (Opp. Br. at 15) the Government cites to its familiar roster of four, forty-five years old cases. None of these cases analyze the actual text of the statute. And while the statute is

---

[1] Judge Pell flagged the vagueness of the term "disturbance" in his partial concurrence and partial dissent to *Dellinger*. ("New ideas more often than not create disturbances, yet the very purpose of the First Amendment is to stimulate the creation and dissemination of new concepts.") (quoting *Landry v. Daley*, 280 F.Supp. 968, 971 (N.D.Ill. 1968)).

unclear about many things, it is clear that the clause "with intent" modifies only the travel or use language in the statute.  18 U.S.C. § 2101(a) ("Whoever travels…or uses….with intent).  The final clause of §2101(a) "and who either during the course of such travel or use or thereafter performs or attempts to perform any other overt act for any purpose specified in [the above] subparagraph[s]" does not contain any *mens rea* requirement.  The Government offers no contrary analysis of the statutory text, because there is none.

## IV.      The Anti-Riot Act is Unconstitutionally Overbroad

The parties agree that the Supreme Court's decision in *United States v. Williams*, 553 U.S. 285 (2008) is instructive on whether or not a statute is facially invalid for being overbroad. *Williams* explains that under the First Amendment overbreadth doctrine, "a statute is facially invalid if it prohibits a substantial amount of protected speech."  553 U.S. at 292.  On one hand a court must balance "the threat of enforcement of an overbroad law deters people from engaging in constitutionally protected speech, inhibiting the free exchange of ideas" while on the other, "invalidating a law that in some of its applications is perfectly constitutional—particularly a law directed at conduct so antisocial that it has been made criminal—has obvious harmful effects." *Id.*  As a result, the law's overbreadth must be "*substantial*, not only in an absolute sentence, but also relative to the statute's plainly legitimate sweep." *Id.*   The first step is to construe the statute, and what it covers, and the second step is to determine whether it "criminalizes a substantial amount of protected expressive activity." *Id.* at 297.

Government's central claim is that the Anti-Riot Act is not overbroad because it "only criminalizes violent action, threats of violence, or incitement to violence that constitute a clear and present danger to persons or property."  Opp. Br. at 18-19.  This Court should reject the Government's attempted reduction of the Anti-Riot Act to simply part of the definition of the term "riot."  It is true that a "riot" requires "violent action," or "threats of violence" where there is a "clear

19

and present danger." But, the Anti-Riot Act criminalizes more than the definition of "riot." It makes it a crime to travel *with the intent* to encourage a riot and then to actually encourage the riot, whether or not the riot ever takes place. It makes is a crime to *intend to promote* a riot on the internet and then to actually promote the riot on the internet. It makes it a crime to travel with the *intent to drive someone else* to the riot and to actually drive someone to the riot even if you take a wrong turn and never find the riot. In fact, the Government seems to forget its jurisdictional limitations entirely when it reduces the Anti-Riot Act to the criminalization of "violent action, threats of violence, or incitement to violence that constitutes a clear and present danger to persons or property." Assault and threats of assault are clearly the province of the states.

The parties agree on the uncontroversial point that violent acts themselves are not afforded protection under the First Amendment. Opp. Br. 20. And yes, some "threats of violence" are outside of First Amendment protection. *Id.* This hardly answers the inquiry of whether the Anti-Riot Act is overbroad because it prohibits a substantial amount of protected speech and expression. The Anti-Riot Act does not punish violent acts, nor does it punish threats of violence. The Government protests that the Anti-Riot Act does not punish a speaker for creating a likelihood of a threat of conduct, but it plainly does. "Whoever…uses any facility of interstate or foreign commerce…with intent…to organize, promote, [or] encourage…a riot….and who…during the course of use…performs or attempts to perform any other overt act for the purpose…[of] organiz[ing], promot[ing], encourage[ing], participat[ing] in, or carry[ing] on a riot." The Government has not disagreed with Mr. Daley's assertion (and the Seventh Circuit's conclusion) that *no riot ever need to occur* to satisfy the elements of the Anti-Riot Act. A speaker may use facilities of commerce (internet, email, telephone) both *intending* to promote a riot that never occurs, and *actually (overtly)* promoting a riot that never occurs, and that conduct is covered by the Act and plainly protected by the First Amendment.

Finally, the Government's incredulity that First Amendment protections are at their zenith when expression is political in nature is belied by extensive caselaw.  *See, e.g., Meyer v. Grant*, 486 U.S. 414, 421 (1988) ((affirming that political speech is an area of public policy where the protection of the First Amendment "is at its zenith  because First Amendment was "fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people") (internal quotation omitted); *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964) ("In the realm of religious faith, and in that of political belief, sharp differences arise…But the people of this nation have ordained in the light of history, that, in spite of the probability of excesses and abuses, these liberties are, in the long view, essential to enlightened opinion and right conduct on the part of the citizens of a democracy.").  Moreover, the fact that the legislative history behind the D.C. Riot Act and the Anti-Riot Act occurred prior to the Supreme Court's decision in *Brandenburg* in no way affects how the legislative history must be read and understood.  Nor was it "dicta" when the D.C. Circuit explained that "Congressional focus was, it is clear from the legislative history, upon mindless, insensate violence and destruction unredeemed by any social value and serving no legitimate need for political expression."  Opp. Br. at 21 quoting *Matthews*, 419 F.2d at 1182.  Social value and political expression are important bases underlying First Amendment cases, a principle stated explicitly in *Mathews*.

## V.       The Statute Lacks Grounding in the Commerce Clause

In responding to Mr. Daley's commerce clause challenge, the Government alleges that the Anti-Riot Act does not focus on purely local conduct.  Opp. Br. 23.  The Government cites to cases that uphold the constitutionality of statutes criminalizing the transport of obscene materials across state lines, interstate travel for purposes of polygamy and prostitution, and the interstate transportation of alcohol.  Opp. Br. 24.  What each of those statutes contains, however, that the Anti-Riot Act lacks, is a *temporal connection between the travel and the illegal act*.  This

21

temporal connection is what impacts interstate commerce. As set forth in the Motion to Dismiss, and above, the Anti-Riot Act lacks the requirement of a temporal connection. Someone can travel with the intent to encourage a riot, moving to another state. Then months later, once established, actually try to encourage a riot in that new state. The attenuation problem inherent in the statute makes it not just overbroad and vague, it removes it from Congressional Commerce Clause authority.

## VI.     The Wharton's Rule Challenge

The Government protests that Wharton's Rule does not apply because the Anti-Riot Act can be committed by only one person. Opp. Br. at 24. But the Government elsewhere alleges that "[t]his case is about four individuals that coordinated, planned, and travelled across the United States to engage in violence." Opp. Br. at 1. The Government further explains that "Defendants engaged in acts of violence on August 11-12, 2017, as part of two related, but distinct public disturbances…" Opp. Br. at. 12. While there are certainly ways to construe the Anti-Riot Act to avoid a Wharton's Rule problem, the Government appears to allege that the defendants in this case committed acts of violence as part of a riot – which requires at least three people. In other words, the statute is so overly broad and vague as set forth above, that there are ways that an individual person can violate the statute, because no riot ever even needs to occur. But as the Government apparently conceives of the charge, it is duplicative of the conspiracy count. Finally, the Government is incorrect that no one would contend that counter protesters and Defendants "conspired" to riot together. The Government apparently intends to introduce evidence at trial about a series of lawfully permitted protests and rallies that occurred in California, prior to August 11 and 12. At each of these events, protesters and counter protesters did plan to attend, and to defend their respective positions.

## CONCLUSION

For the reasons set forth in the Motion to Dismiss as supported in this Reply, the Court

should dismiss the Indictment.

Respectfully submitted,

BENJAMIN DALEY

By Counsel

Counsel:
/s Lisa M. Lorish
Lisa M. Lorish (VSB No. 81465)
Assistant Federal Public Defender
Office of the Federal Public Defender
401 E. Market St, Ste 106
Charlottesville, VA 22902
Tel (434) 220-3380

Frederick T. Heblich, Jr. (VSB 21898)
Assistant Federal Public Defender
Office of the Federal Public Defender
401 E. Market Street, Ste. 106
Charlottesville, VA 22902
Tel. (434) 220-3386

## CERTIFICATE OF SERVICE

I hereby certify that on March 27, 2019, I electronically filed the foregoing with the Clerk

of the Court using the CM/ECF system which will send notification of such filing to the

following: counsel of record; and I hereby certify that I have mailed by United States Postal

Service the document to the following non-CM/ECF participants: none.

s/ Lisa M. Lorish
Asst. Federal Public Defender