1              IN THE UNITED STATES DISTRICT COURT
                 WESTERN DISTRICT OF VIRGINIA
2                  CHARLOTTESVILLE DIVISION

3

UNITED STATES OF AMERICA,          )
4                                  )
            Plaintiff,             )
5       vs.                        )
                                   ) CRIMINAL NO.: 3:18-CR-25-1
6   BENJAMIN DRAKE DALEY,          )
                                   )
7            Defendant.            )
                                   )
8   _____)

9

        FTR Transcript of Proceedings - Detention Hearing
10           Before the Honorable Joel C. Hoppe
                      December 3, 2018
11               Charlottesville, Virginia

12

For the Plaintiff:
13
        CHRISTOPHER ROBERT KAVANAUGH, AUSA
14      United States Attorneys Office
        255 West Main Street, Room 130
15      Charlottesville, Virginia  22902
        434-293-4283
16      christopher.kavanaugh@usdoj.gov

17      THOMAS T. CULLEN, AUSA
        United States Attorneys Office
18      310 First Street, SW, Suite 906
        Roanoke, Virginia  24011
19      540-857-2901
        thomas.cullen@usdoj.gov

20

21   _____

22       Transcribed by Mary J. Butenschoen, RPR, CRR
                Federal Official Court Reporter
23                   Roanoke, Virginia

24

25

```
 1   For the Defendant:

 2        LISA M. LORISH, FPD
          Federal Public Defenders Office
 3        Western District of Virginia
          401 E. Market Street, Suite 106
 4        Charlottesville, Virginia  22902
          434-220-3388
 5        lisa_lorish@fd.org

 6

 7                        * * * * *

 8

 9                   INDEX OF WITNESSES

10   WITNESSES ON BEHALF OF THE GOVERNMENT:              PAGE

11                    (NONE)

12   WITNESSES ON BEHALF OF THE DEFENDANT:

13   JOAN DALEY
          Direct Examination by Ms. Lorish            7
14        Cross-Examination by Mr. Kavanaugh          15
          Redirect Examination by Ms. Lorish         21
15

16                        * * * * *

17

18                   INDEX OF EXHIBITS

19   EXHIBITS ON BEHALF OF THE GOVERNMENT:

20          EXHIBIT                  Marked   Admitted

21          1-18                              22

22   EXHIBITS ON BEHALF OF THE DEFENDANT:

23          EXHIBIT                  Marked   Admitted

24                    (NONE)

25
```

1    (Proceedings commenced at 1:14 p.m.)

2              THE COURT:  Good afternoon.

3              COUNSEL:  Good afternoon, Your Honor.

4              THE COURT:  Would the clerk please call the case.

5              THE CLERK:  Yes, Your Honor.  This is Criminal

6    Action Number 3:18-cr-25.  *United States of America v.*

7    *Benjamin Drake Daley*, defendant number 1.

8              THE COURT:  All right.  Is the government ready to

9    proceed?

10             MR. KAVANAUGH:  Yes, Your Honor.

11             THE COURT:  And is the defendant ready to proceed?

12             MS. LORISH:  He is, Your Honor.

13             THE COURT:  Ms. Lorish, this is your motion, and if

14   you want to clarify what the procedural posture is of the

15   motion.

16             MS. LORISH:  Yes, Your Honor.  So as the Court is

17   aware, Mr. Daley appeared originally in the arresting

18   jurisdiction in California, and, though he did not make any

19   requests for release at that time, a detention hearing was

20   held and the magistrate judge there made findings supporting

21   detention.

22             He is now seeking to reopen that detention hearing

23   here pursuant to, essentially, a combination of 18 U.S.C.

24   3142(f)(2) that allows a judicial officer to reopen a bond

25   hearing, and also the statute -- sorry, I've got lots of

1    papers here today, Your Honor.  18 U.S.C. 31 -- sorry,

2    3145(b).  We also believe Federal Rule of Criminal Procedure

3    40(c) supports this Court reviewing the evidence today in

4    support of his request for release.

5           I think at this point the government is not opposing

6    proceeding before this Court, but I'll let Mr. Kavanaugh speak

7    for himself.  In the event that there is any furthering

8    question about whether this is the right forum to proceed, we

9    at least ask the Court to take evidence today, what we have

10   out of town witnesses present.

11          THE COURT:  All right.

12          MS. LORISH:  Thank you.

13          THE COURT:  All right, Ms. Lorish.  Mr. Kavanaugh?

14          MR. KAVANAUGH:  Your Honor, I have a couple of

15   clarifications, or at least from the government's perspective

16   is that it's not that we -- that the government didn't seek

17   his release.  It's that the government, in their defense,

18   submitted on the record after the government's argument in

19   Central District of California, which we believe -- don't mean

20   to quibble, but we think it's a small distinction.  We do feel

21   and maintain that our law as laid out in our memorandum is

22   correct, and if I'm completely honest it wasn't until I was in

23   front of Your Honor in another matter where I heard Your Honor

24   mention that typically where there's a detention hearing

25   somewhere else that Your Honor doesn't take up the detention

1    hearing unless there's a change in circumstances.  And I

2    again, to look at the law and some of the cases that are

3    behind it, *Cisneros* from the Tenth Circuit as well as *Cannon*

4    from the Eastern District of Virginia kind of seem to

5    continuously be cited.  It was cited by the defendant in their

6    brief, and it appears to us that still the -- both of those

7    cases stand for the proposition that a reopening of the

8    detention hearing under 3142(f) by its terms is only for the

9    original magistrate who made the decision.

10          That being said, is that I -- notwithstanding the

11   fact we believe that the proper forum is in front of Judge

12   Moon, we're still happy to proceed for the detention here in

13   front of the Court if that's what the Court prefers.

14          THE COURT:  I think if it's an appeal, certainly

15   that's in front of Judge Moon.  If it's -- if it's reopening

16   to allow new evidence -- and I would note from the California

17   bond report I think Mr. Daley's parents didn't provide

18   information for that, and as I understand it now part of the

19   defendant's bond plan is -- from the probation officer is that

20   his parents are here and in support.  And it seems like

21   there's at least some new information.

22          I think you're -- I think you're right that any

23   legal issues I think would have to be appealed rather than

24   reconsider those.  I don't think that's a new -- you know, a

25   new circumstance.  So it's like the basis for holding a

```
 1    detention hearing I would think would be a -- would be

 2    something that would need to be appealed rather than reargued

 3    to a magistrate judge.

 4              MR. KAVANAUGH:  In any event, we have no opposition

 5    to moving forward today, Your Honor.

 6              THE COURT:  Okay.  All right.

 7              Ms. Lorish, do you want to make any opening

 8    statement or do you want to go ahead and start calling

 9    witnesses?

10              MS. LORISH:  Only to clarify that I'm not going to

11    argue regarding the basis for detention hearing.  You know, I

12    submit that was in the written briefs and understand the Court

13    finds that that is in the nature of an appeal that would have

14    to be taken up with Judge Moon, and we'll just present the

15    release plan for Mr. Daley today, and I'll be calling his

16    mother, Joan Daley, and I would just like to go ahead and do

17    that now.

18              THE COURT:  Okay.

19              MS. LORISH:  So Ms. Daley?

20              THE COURT:  Ms. Daley, if you would come over to the

21    seat, but before you sit down please raise your right hand.

22                   JOAN DALEY, CALLED BY DEFENDANT, SWORN

23              THE COURT:  You may be seated.

24    ///

25
```

```
 1                       DIRECT EXAMINATION
 2    BY MS. LORISH:
 3    Q    All right.  Why don't you share with the Court your full
 4    name.
 5    A    It's Joan Daley.
 6    Q    And how do you know the defendant?
 7    A    He's my son.
 8    Q    What state did you fly in from to be here today for this
 9    hearing?
10    A    Oregon.
11    Q    Did you come with anybody else?
12    A    Yes, my husband Dan.
13    Q    And is he here in the courtroom today?
14    A    Yes, he is.
15    Q    And, Oregon is the state where you currently reside?
16    A    Yes, we do.
17    Q    And we're deliberately not going to use the name of the
18    city that you live in here in open court today for privacy
19    reasons; is that correct?
20    A    Correct.
21    Q    But you did have the opportunity to speak with someone
22    from pretrial services here from the Western District of
23    Virginia on the phone prior to today's hearing; is that
24    correct?
25    A    Correct.
```

J. Daley - Direct                                                8

1   Q     And you gave them your full address and information?

2   A     Absolutely.

3   Q     And then you again spoke with someone from pretrial

4   services today before the hearing here in person --

5   A     Correct.

6   Q     -- and confirmed all that information.

7         How long have you lived at that address that you provided

8   to probation in Oregon?

9   A     25 years.

10  Q     And is that the address where Ben grew up?

11  A     Yes, it is.

12  Q     What do you do for employment now?

13  A     Well, my husband and I run a construction company

14  together, and I work from home with also some additional

15  selling that I do from my house, a clothing and jewelry

16  business.

17  Q     Is that a construction company that you own?

18  A     Yes.

19  Q     With your husband?

20  A     Yes.

21  Q     Are there any other owners?

22  A     None.

23  Q     And your husband and you are willing to employ Ben with

24  that construction business were he to be released from this

25  Court; is that correct?

1    A    Absolutely.

2    Q    And that would be full-time employment?

3    A    Yes.

4    Q    How would Ben get to work every day?

5    A    Well, he could easily go with my husband in a truck every

6    day and back.

7    Q    Okay.  And when did Ben leave home?  When did he move

8    away from your residence in Oregon?

9    A    It's been about seven years at 17-and-a-half.  He was

10   almost 18.

11   Q    Okay.  And did Ben have a drug problem in high school?

12   A    Yes, he did.

13   Q    What did you do to help him with treatment with that drug

14   problem?

15   A    Well, we removed him from our house at 17.  That was his

16   first -- that's when he left the house, and we put him through

17   a drug therapeutic boarding school, boys boarding school.

18   Q    And did you do that -- was he in favor of that or did you

19   force him?

20   A    No, against his will.

21   Q    So you put him into a boarding school.  Did you pay for

22   any other treatments?

23   A    Yes.  He went to -- the first one wasn't successful, and

24   so we -- and he was not challenged, so we put him through two

25   more until we finally got it right, and we did.

J. Daley - Direct                                           10

```
1    Q    Ultimately, what do you know about Ben's sobriety
2    today?
3    A    That he's, at 25 years old, five years sober and worked
4    very hard at it and feel very good that he's solid in his
5    sobriety.
6    Q    When Ben ultimately settled then after he finished drug
7    treatment, he settled in LA; is that correct?
8    A    Yes, he did.
9    Q    And as far as you know he's been living in the Los
10   Angeles area since then?
11   A    Yes.
12   Q    How much contact -- of course understanding that things
13   change from week to week, but approximately how much contact
14   have you had with him over the last six-and-a-half, seven
15   years that he's been in LA?
16   A    A couple of times -- at minimum, two or three times a
17   month.  Usually up to probably once a week.
18   Q    Is that usually by phone?
19   A    Yes.  And visits, whether we would visit, but that was
20   only a couple times a year.  But we would speak to him at
21   least, you know, on the phone two to three times a month.
22   Q    Okay.  At some point in 2017 Ben asked you for help
23   booking a flight to Charlottesville; is that correct?
24   A    That is correct.
25   Q    And what did you know about why he wanted to come to
```

```
 1    Charlottesville?

 2    A     Honestly, we -- at that time I think that was the

 3    first -- if not the first or second trip Ben took by himself,

 4    and we -- what we knew of it is that he had a girlfriend back

 5    there, or a girl that he was close with, that he wanted to

 6    see.  And we saw it as an opportunity for him to see more than

 7    just Los Angeles.  He had always lived either in Oregon or in

 8    Los Angeles, and it was, we hoped, to be a broadening

 9    experience for him to see other parts of the country.

10    Q     Did you know about the Unite the Right rally?

11    A     Definitely not.

12    Q     Did you know there was likely to be violence at that

13    rally?

14    A     Absolutely not.

15    Q     But you found out about that afterwards.

16    A     Yes.

17    Q     And how did you find out about that afterwards?

18    A     Well, I -- I believe what happened, Ben called us, got me

19    on the phone from Washington, DC, and sounded disturbed and

20    upset, and -- and he explained what had happened.  And I think

21    by then we had seen the news.  And we discussed that his

22    ticket was -- he was in DC, he was seeing a girl, and

23    basically, you know, I said why would you go back there.

24    There's so much trouble there right now, don't -- don't.  It

25    seemed like not a safe place.  And I suggested that we help
```

1    him fly straight from DC to our -- to his home at that time,

2    which was still in Los Angeles.

3    Q    So the original return point was from Charlottesville?

4    A    Yes.

5    Q    And you helped him change --

6    A    I encouraged him to not, because it -- it seemed like a

7    not safe place to go after that new information.

8    Q    You helped book -- you booked the flights for him, but

9    who ultimately paid for the flights?

10   A    Ben paid for them.

11   Q    He paid you back?

12   A    Yes, yeah.

13   Q    And so I'm going to ask you a few questions about what it

14   would look like if Ben was released to live at your home.

15   A    Okay.

16   Q    Does anybody else live at your home besides you and your

17   husband?

18   A    No.

19   Q    And is this the home that you have lived in for 25

20   years?

21   A    Yes.

22   Q    And you own?

23   A    Yes.

24   Q    And -- and we've talked a bit about what it means to be a

25   third party custodian --

J. Daley - Direct                                          13

1    A      Uh-huh.

2    Q      -- you and I have.  And if the Court were to consider

3    that today, you would hear a lot more instructions from the

4    judge about what that looks like.

5    A      Okay.

6    Q      But as a third party custodian you would be responsible

7    to listen very carefully to the orders that this Court would

8    give Ben while he's released on pretrial supervision, and

9    you'd be responsible to pick up the phone the first hint you

10   have that you think Ben is not complying with those orders.

11          Is that your understanding of what it would mean?

12   A      Absolutely.

13   Q      You'd be under a court order to do that.

14   A      I have no problem with that whatsoever.

15   Q      So you have no concern about ensuring that you would

16   report anytime that Ben violated the Court's orders.

17   A      No, I -- I have no concerns, and I -- and I have

18   discussed this with Ben directly and my husband, yes.

19   Q      And have you installed a landline in your home?

20   A      Yes, we have.

21   Q      And you just did that recently --

22   A      Yes.

23   Q      -- in anticipation that if Ben were released he would

24   likely be released on home electronic monitoring?

25   A      I'm sorry, what?

1    Q    That if Ben was released --

2    A    Uh-huh.

3    Q    -- he'd be released on home monitoring?

4    A    Yes.

5    Q    And you're aware that there will be some costs associated

6    with his home monitoring and of course flying back to

7    Charlottesville --

8    A    Yes.

9    Q    -- for any court hearings.

10   A    Yes.

11   Q    And you're prepared to assume the costs of those

12   things --

13   A    We are prepared.

14   Q    -- at least at this time so he can pay you back.

15   A    Yes.

16   Q    Okay.  Let me just review my notes for one moment.

17        Are you aware of what Ben does right now to help maintain

18   his sobriety?  Is he participating in any treatment?

19   A    Well, he's -- he's been religious with his AA

20   involvement.  He has a very strong support system down in Los

21   Angeles, and we are concerned that he doesn't have that right

22   now.  It's even the point of the *Big Book* that he -- you know,

23   that he has with him at all times, he can't -- he doesn't have

24   it yet, as far as I know, in jail.

25   Q    Would you be willing to provide transportation for him to

```
 1    participate in AA meetings after he's released?

 2    A    Absolutely.

 3              MS. LORISH:  Okay.  I don't have any further

 4    questions for you at this time.

 5              Oh, I should add one more question.

 6    BY MS. LORISH:

 7    Q    You're aware that if the Court releases him it will

 8    likely be with restrictions that he's not allowed to access

 9    the internet?

10    A    Absolutely.

11    Q    Does that provide any concerns for you?

12    A    None whatsoever.

13    Q    So you would work with probation to ensure that any

14    devices that could access the internet in your home would be

15    password protected?

16    A    Or removed.

17    Q    Or removed entirely.

18    A    Absolutely, a hundred percent.

19              MS. LORISH:  Any questions the prosecutor may have

20    for you now.  Thank you.

21              THE WITNESS:  Okay.

22                        CROSS-EXAMINATION

23    BY MR. KAVANAUGH:

24    Q    Good afternoon, ma'am.  My name is Chris Kavanaugh, and

25    I'm with the United States.  I have a few questions for you.
```

```
1     A     Okay.

2     Q     I apologize for my voice today.

3           You're son is how old?

4     A     He is 25.

5     Q     Okay.  And he has not lived under your roof for eight

6     years; is that correct?

7     A     Seven and --

8     Q     Seven?

9     A     Yeah, roughly.

10    Q     Seven-and-a-half, okay.  And for the past five or so

11    years he's been living in the Los Angeles area; is that

12    correct?

13    A     Seven years.

14    Q     Seven years.

15    A     Yeah, from 18 on he's -- seven years.

16    Q     And where in California was he living at the time of his

17    arrest?

18    A     At the time of his arrest?  In the South Bay.  The city

19    is Torrance, I believe.

20    Q     Okay.

21    A     Or Redondo Beach, I don't know.  It's a fine line

22    there.

23    Q     Do you know the address?

24    A     Not off the top of my head, no, because we use a PO Box

25    always.
```

1    Q    Okay.  And Mr. Daley uses a PO Box; is that correct?

2    A    My son?

3    Q    Yes.

4    A    Yes, sorry.

5    Q    I'm sorry.

6    A    I thought of my husband.

7    Q    No.

8    A    Ben uses -- had always had a PO Box.

9    Q    Okay.  So he does not, you know, receive mail at his own

10   personal address.

11   A    No.

12   Q    And during that seven-and-a-half years he had been living

13   on his own?

14   A    Yes.

15   Q    A couple of things that you stated about -- in your

16   direct testimony is that Mr. Daley asked you to book tickets

17   for him to fly to Charlottesville, correct?

18   A    Uh-huh.

19   Q    Is that correct?

20   A    Yes.

21   Q    Just has to be yes or no for the record.

22   A    Oh, okay, yes.

23   Q    And then he said that was to visit a girlfriend; is that

24   correct?

25   A    Well, yeah, and to travel just to see a different part of

1    the country, you know.

2    Q    Okay.  And he did not tell you he was going to the Unite

3    the Right gathering.

4    A    No.

5    Q    So he lied to you?

6    A    Well, you know, I don't know that it was called all that

7    then.  And you have to understand this was a couple years ago,

8    but no.  I just think it was vague why he was going.  And

9    honestly we welcomed it because we saw it as -- you know, we

10   were concerned about some of his beliefs and felt like the

11   more he saw of our country the more rounded he would become.

12   Q    What beliefs were you concerned about?

13   A    Well, just -- just some concerning political beliefs,

14   things that we weren't -- he wasn't raised with that we didn't

15   understand and don't agree with.

16   Q    And you said that it was vague.  To clarify, vague to

17   you; is that correct?

18   A    Well, yeah.  I mean, at the -- that's the best I can give

19   you.  It was somewhat vague.  I know there was a girlfriend,

20   and, honestly, when you're 20 -- he was probably 23 at the

21   time who had traveled a great deal on his own, you know, and

22   was sober and doing what we saw were right things.  It was

23   something that I saw as a healthy thing to do.

24   Q    And so at no point in time did you know he was traveling

25   to come to the Unite the Right rally.

1   A     No.

2   Q     You also said that you booked the flights but he

3   ultimately paid you back; is that right?

4   A     Yeah.

5   Q     And Mr. Daley has a credit card, correct?

6   A     Well, at that time I'm not sure.  I honestly can't say.

7   I know he does now, but I don't know then.

8   Q     So you're not aware of his financial accounts?

9   A     No, he's been independent.

10  Q     Has Mr. Daley ever expressed to you a concern about him

11  using his own card for things so that there's not a paper

12  trail?

13  A     No.

14  Q     You mentioned that you have a landline at your house and

15  also that you have access to the internet at your house,

16  right?

17  A     Yes.

18  Q     You also mentioned about how the -- Mr. Daley had been

19  in -- sorry, your son had been in AA, correct?

20  A     Yes.

21  Q     And isn't it true that his sponsor in AA is actually a

22  sympathizer to white supremacist views?

23  A     I don't know his sponsor.  I mean, I've -- he picks his

24  sponsor.  We don't.  We have met him since --

25  Q     You have met the sponsor?

```
 1    A    Just recently.

 2    Q    Okay.

 3    A    And I would be concerned now, but I did not -- we didn't

 4    meet him until just recently.

 5    Q    And if you could tell the Court, why would you be

 6    concerned now?

 7    A    Well, because there was -- what little you speak -- we

 8    spoke to him for maybe ten minutes.  Because here we are, a

 9    son in jail needing support for -- for his addiction with a

10    sponsor, and we don't have his phone number, so we get his

11    phone number by meeting him.  And, you know, we're just -- it

12    was a little concerning, yeah.  But, I mean, that's the extent

13    of our conversation, was his phone number.

14    Q    Were any of your concerns related to his -- to the

15    sponsor's views as well?

16    A    Well, I didn't speak to him long enough to know his

17    views.  I had to surmise that from just a general appearance

18    and priorities that appeared to be, but I can't say that.

19    Q    Ma'am, you touched on this today, but at some point in

20    time you realized that your -- or had concerns about your

21    son's beliefs, correct?

22    A    Uh-huh.

23    Q    And did you confront him about those beliefs?

24    A    Well, we had a lot of conversations as any active parent

25    would do.  Yeah, we had a lot of conversations.
```

1    Q    And did you convince him to go on a different path or

2    separate himself from --

3    A    We encouraged him to consider that this wasn't a healthy

4    choice and we didn't believe what he was, you know, saying.

5    We didn't agree with it, didn't support it.

6              MR. KAVANAUGH:  Thank you.  Those are all my

7    questions, Your Honor.

8              THE COURT:  Ms. Lorish, anything else?

9                        REDIRECT EXAMINATION

10   BY MS. LORISH:

11   Q    If Ben is released to live in your home and you're

12   serving as a third party custodian as you indicated you'd be

13   willing to do, would he be welcome to express the kind of

14   views that you just discussed with Mr. Kavanaugh --

15   A    No.

16   Q    -- in your home?

17   A    Not at all.

18             MS. LORISH:  Thank you.

19             THE COURT:  All right.  Thank you, Ms. Daley.

20             THE WITNESS:  Okay.

21             MS. LORISH:  Thank you.

22             (Witness excused)

23             MS. LORISH:  I don't have any other evidence, Your

24   Honor, just argument, but I don't know if the government

25   intends to put on evidence.

USA v. Benjamin Drake Daley - 3:18-cr-25          22

1                THE COURT:  Okay.  Mr. Kavanaugh, do you have any

2     evidence that you would like to to present?

3                MR. KAVANAUGH:  Yes, Your Honor.  We have -- not

4     through written testimony, but we have submitted 18

5     photographs to the court.  I'm happy to make an argument on

6     the basis of 3142(g) factors and want the Court to review

7     those, but we do not have any sworn testimony to provide the

8     Court.

9                THE COURT:  All right.  And Ms. Lorish, you have

10    those photographs there?

11               MS. LORISH:  I do, Your Honor.

12               THE COURT:  All right.  Do you have any objection to

13    me considering those?

14               MS. LORISH:  I don't object to the consideration of

15    the photographs, Your Honor.

16               (Government Exhibit 1 - 18 marked and admitted.)

17               THE COURT:  All right.  Mr. Kavanaugh, do you want

18    to walk me through these exhibits?

19               MR. KAVANAUGH:  Yes, Your Honor.

20               Your Honor, I was going to do so in addressing the

21    3142(g) factors.  I understand this is the defense motion, so

22    I'm happy to respond to their argument or to do it just right

23    now, whatever Your Honor would like.

24               THE COURT:  Well --

25               MR. KAVANAUGH:  Or I can literally go page by page

1    through these and we can talk about each one.  Or I can

2    provide a brief summary of them.

3             THE COURT:  Ms. Lorish, I'll give you an opportunity

4    to respond to anything that Mr. Kavanaugh says in his

5    argument, so why don't we go ahead.

6             MS. LORISH:  That's fine, Your Honor.

7             THE COURT:  And you can present your argument,

8    Mr. Kavanaugh.  You can discuss these photos in your

9    presentation.

10            MR. KAVANAUGH:  Your Honor, so yes, I will be

11   talking about those photographs.  Otherwise we would like to

12   proceed by proffer into our argument.  And regarding 3142(g)

13   factors, it doesn't sound like Ms. -- I think the parties have

14   adequately briefed the bases for which we're requesting the

15   detention hearing under the fact that the defendant is a risk

16   of flight and then also he was charged with a crime of

17   violence.  And which brings me to the very first 3142(g)

18   factor that is being the nature and circumstance of the

19   offense alleged here, that the defendant has been charged with

20   two crimes of violence, both legally as qualifying under the

21   Bail Reform Act as well as factually.

22            The defendant is charged with being a member and, in

23   fact, a founding member of the white supremacist organization

24   the Rise Above Movement which has been charged with traveling

25   with intent to engage in acts of violence in three places in

1      the indictment, which are Huntington Beach, California, on

2      March 25, 2017; Berkeley, California, on April 15, 2017; and

3      then, finally, Charlottesville on both August 11 and August

4      12, 2017.

5              And the evidence that we have, including some of the

6      photographs, is that the -- this organization would train in

7      preparation to engage in combat with their political foes, or

8      people they perceived to be their political foes, with

9      particular focus on minorities such as African-Americans,

10     Jewish persons, as well as women.  And that for these charges

11     the defendant faces up to ten years incarceration.

12             With respect to the second factor under 3142(g), it

13     goes to the nature of the strength of the government's

14     evidence.  In Government's Exhibits 1 through 4 that are

15     before the Court, those go to the nature of the organization

16     that the defendant is involved in.  And, ultimately, what

17     their intent and purpose is in engaging in this organization,

18     one of the photographs shows that -- this is a photograph of

19     its members, including the defendant, When the squad is not

20     out smashing commies, on March 9 of 2018.  It was a photograph

21     of them from their Twitter page wearing skull masks to

22     disguise their view -- to disguise their visage at places such

23     as they did in Berkeley.

24             Exhibit 3 is from March 20 of 2018 in which it shows

25     the defendant with a flag that says Good Night Left Side and

1    someone appearing to stomp on an individual below him.

2             This organization, in addition to training and --

3    for these political rallies as well as attending the political

4    rallies, they also engaged in extracurricular activities to

5    include book burning.  And in Government Exhibit 4 it depicts

6    the defendant, as well as his co-defendant, Tom Gillen,

7    participating in a book burning in the summer of 2017 where

8    they are burning books such as *The Diary of Anne Frank*, *The*

9    *9/11 Commission Report* and a book *Trapped in Hitler Hell*.

10            That is kind of just background for the organization

11   for the Court that is at the center of the conspiracy charge

12   and some of the evidence that goes to that conspiracy in that

13   organization.

14            Moving on next is the first event that occurred in

15   the indictment, is Huntington Beach on March 25 of 2017 when

16   the defendant was still on probation for his prior offense.

17   Is that on that day the defendant, as well as additional

18   co-conspirators, Robert Rundo, Tyler Laube, Robert Bowman, and

19   Michael Miselis, all met at Huntington Beach on March 25 of

20   2017.  At that location it was much like or similar to what

21   occurred in Berkeley.  It was a pro-Trump rally and there were

22   counter-protesters that showed up.  At one point about three

23   to five counter-protesters start to walk away or walk up the

24   beach away from the scene, whereas the defendant and his group

25   pursued them and a violent confrontation ensued.  The most

1    notable of the confrontations did not include the defendant.

2    Rather, it included his co-founding member, Robert Rundo, in

3    which he tackled a counter-protester, punched him and took him

4    to the ground, and then punched him while he was

5    on the ground.

6            And the reason that this event is so important is

7    this is actually kind of what put Rise Above Movement on

8    the -- on the map, and the defendant recognized this and

9    celebrated this as -- in text messages the very next day.

10           This event was captured on photos and video, and in

11   a photo that shows Robert Rundo punching and pummeling this

12   counter-protester that was pasted to the front page of The

13   Daily Stormer, which is believed to be -- or known to be an

14   alt-right website, and the defendant text messages his friends

15   to include Michael Miselis to say, you know, Front page of the

16   Stormer that we -- we did it.  To which Mr. Miselis replies

17   like, Great job, we've achieved celebrity status.

18           And this is one of the very first events that

19   ultimately led to what happened in Berkeley and in

20   Charlottesville.  And after this happened in Huntington Beach,

21   there's a shift in which you can see that the defendants moved

22   their focus to Berkeley of April of 2015.

23           And one of the things that was interesting with

24   Ms. Daley's testimony is that the defendant used his own debit

25   card in preparation for April 15 to purchase and rent an

 1    11-passenger van for himself as well as as many as ten other

 2    R.A.M. members to travel six hours from Southern California

 3    all the way to Berkeley to engage in subsequent acts of

 4    violence.  The defendant's credit card -- and these are from

 5    records from airport van rental which the government has

 6    received and has shown to defense counsel, is that -- has the

 7    defendant's credit card but does not have his name.  And,

 8    rather, another co-conspirator by the name of Aaron Eason

 9    ultimately rented that van, and that the text messages

10    indicate that Michael Miselis and that they all planned to go

11    to Berkeley for this purported political rally and that they

12    had been trained, had several training sessions, to prepare

13    for that political rally.

14         And Government Exhibit 5 shows the defendant

15    actually when he's at that political rally on April 15, 2017.

16    And in this is a photograph that was taken from -- this is

17    available on open sources, but this photograph itself is from

18    the defendant's own Facebook account, and he identifies

19    himself as the person on the left in the skull mask as they

20    are taking the anti-fascist banner of a professor, female

21    professor, that is in Northern California.  The defendant is

22    in a conversation about this and identifies himself in the

23    photo and says that -- specifically that we stole her banner

24    at the April 15 riots and that, "My boy supposedly kicked her

25    in the face."  That's the defendant's quote from his own

1  Facebook about what happened on April 15 in the aftermath of

2  it.

3          The riots at Berkeley, they centered in two places.

4  Well, first, they started at the Martin Luther King Civic

5  Center Park, or in front of the civic center, where they are

6  engaged in acts of violence back and forth where there was one

7  side of counter-protesters and one side of which the defendant

8  was on, and there were objects being thrown back and forth.

9  And they were separated by two chief construction orange

10  fences, and there were police officers that were between them.

11  And through eyewitness testimony, through video that was on

12  top of the buildings looking down at the civic center, as well

13  as statements admitting on the R.A.M.'s Twitter account, is

14  that they were the first ones to cross that barrier onto the

15  side where the counter-protesters are, indicating these are

16  not in any way acts of self-defense, but they were the first

17  persons to be able to escalate and cross that barrier to

18  engage in acts of violence.  And the defendant is seen on

19  video doing that.

20          After these acts of violence continued there in the

21  park, they spill on into the street in which the defendant is

22  part of a group of individuals, as well as his co-defendants

23  in the case, all three of them, Thomas Gillen, Cole White, and

24  Michael Miselis.  And as the counter-protesters are leaving,

25  all four of those defendants, including Mr. Daley, follow and

1    chase after them.  And at one point the defendant runs and

2    kicks one of the counter-protesters as that person is leaving.

3          And this brings us up to the next one that is

4    charged in the indictment, that being the riots that occurred

5    in Charlottesville on August 11 and August 12.  The defendant

6    and fellow members all purchased tickets to come here to the

7    United States -- to come here to Charlottesville.  According

8    to the testimony today, it wasn't the testimony himself who

9    purchased the ticket, but, rather, it was his mother that

10   was -- who purchased the ticket herself.

11         And the government thought that that was

12   particularly interesting because the defendant sends a text

13   message to Michael Miselis.  Michael Miselis had already

14   arrived in Charlottesville, was at the Walmart buying torches

15   and helmets, and the defendant specifically advises him make

16   sure not to use your card, use cash, indicating that the

17   defendant did not want his own card or anybody's card

18   affiliated with what was happening.

19         In advance of those April -- August 11 riots, the

20   defendant enters -- the defendant knew and evidence is going

21   to show that the defendant knew that violence was to be

22   expected in Charlottesville as he -- he entered into the chats

23   of discord, and on discords specifically in which his name is

24   identified as Ben Daley, says that he was looking for lodging

25   for three guys who were experienced at these types of events.

USA v. Benjamin Drake Daley - 3:18-cr-25          30

1  And then, quote, All were in the Berkeley riots.  Which is

2  relevant to his intent of what he expected Charlottesville to

3  be and why he was coming.

4        He called up a co-defendant in which he said that

5  Charlottesville was going to be like Berkeley again and that

6  it was going to be the event of the year and sent text

7  messages, again, in advance before coming to Charlottesville

8  to Michael Miselis that Cole White was going to be coming with

9  them and that he's an excellent fighter and that he was stoked

10  to have him with them, all relevant to his intent prior to him

11  traveling.

12        Once he arrived here in Charlottesville, he went to

13  the Walmart on 29 between here and the airport, purchased

14  white tape as well as a knife and other items, and that

15  evening is confirmed on video and on photo as being present at

16  the tiki torch rally, at the tiki torch rally where, as the

17  Court is well aware from the allegations and of the

18  indictment, Chance of blood and soil and Jews will not replace

19  us and black lives matter occurred, as this large group

20  surrounded students and community members at the Thomas

21  Jefferson statue.

22        And the defendant ultimately talked about how they

23  had them completely surrounded.  And he did so on his own

24  Facebook in which he talked about how he -- there was no need

25  for the release of OC spray, or chemical spray that evening,

1    because they had the students and community members completely
2    surrounded.
3            The defendant admits on Facebook that he assaulted
4    five people that evening, and the government has developed
5    further evidence that he told somebody afterwards that he was
6    in a -- he assaulted people in the melee, then he took a
7    break, and then went in to join for more and lamented that he
8    needed to stop punching people in the head because of his hand
9    and it was where he was going to break his hand.
10           Which brings us to the morning of August 12 when the
11   defendant actually wraps his right hand or his hands in
12   preparation the government would -- to engage in combat much
13   like Thomas Gillen and Michael Miselis.  And just as in
14   Berkeley where they were one of the first people to cross that
15   barrier, so too in Charlottesville the defendant was part of a
16   group that set off one of the very first, if not the first,
17   act of violence on the morning of August 12.  That was on
18   Second Street between High and Jefferson Streets in downtown
19   Charlottesville.  The defendant is captured on videos and
20   photographs of those actions, some of which were in the
21   criminal complaint.
22           I'm going to point the Court to Government's
23   Exhibits 6 through 10.  In Government Exhibit 6, this is the
24   defendant who is punching a African-American counter-protester
25   who had blocked his path or blocked the path of people that he

1    was with.

2            In Government Exhibit 7 is the defendant assisting

3    Cole White as Cole White was headbutting a female protester

4    throwing her out on the street who was in their way.

5            In Government Exhibit 8 you'll see the defendant on

6    the left side of the photograph where he is attempting to wrap

7    his right hand around the neck or grab the female protester by

8    the neck.

9            And Government Exhibits 9 and 10 which show the

10   defendant strangling a separate female protester who was

11   present on the streets that day.  And these photographs are

12   particularly important for a couple of reasons.  Number one is

13   that the defendant later -- well, I won't get ahead of myself.

14   We'll talk about that in the afternoon.  But immediately after

15   this altercation, Your Honor, as the defendant and his

16   codefendants made their way through this group, they were

17   followed by a videographer with *National Geographic*.  And as

18   they went on the neighboring street, which I believe was First

19   Street -- they turned around on High Street and then went down

20   First Street -- the defendant looked at the camera and flipped

21   the middle finger to the camera and then, giving a

22   throat-slashing gesture as in Government Exhibits 11 and 12,

23   said, "Time's up." And then as he's giving the throat-slashing

24   gesture in Government Exhibit 12 says, "All of you."

25            Later that day the defendant is on video footage --

1    even particularly the video footage captured by the GoPro that

2    Michael Miselis is wearing shouting into the crowd, F these

3    Jews, and again doing the throat-slashing gesture as well.

4          In the aftermath of this, Your Honor, there is a

5    couple of things that I want to point out.  The defendant's

6    text messages, as well as other statements made by the

7    defendant, is that when these photographs surfaced,

8    particularly the one of the woman strangling -- the one of the

9    female he was strangling, he sent them to a -- to Michael

10   Miselis on his text messages, and Michael Miselis replied

11   back:  LOL at you choking a B-I-T-C-H.

12         To which the defendant -- and hopefully no one finds

13   these photographs.  To which the defendant replied:  F these

14   hoes, 24 -- and then it says 24/7 THOT patrol.  That's THOT,

15   T-H-O-T, which is a derogatory reference to a female that

16   stands for an acronym That Hoe Over There.  Celebrating that

17   they had attacked these females on the streets of

18   Charlottesville.

19         In rehashing additional footage, the defendant

20   also -- once he has gone back to California, the government

21   has received evidence and expects the evidence at trial to

22   show that he is -- on August 22, just a couple of weeks

23   afterwards while Charlottesville was still in the news, is

24   that he goes to a bar and has a conversation with an

25   individual who he was trying to recruit.  And he shows the

1  individual a photo that was not seen and talks about how his
2  hand was hurting.  Said that, We go to these events to wreak
3  havoc, to cause violence.
4          He said -- one of the other things he says, We're
5  going after feminists now, or feminists are one of their
6  targets now, which for the government is consistent with
7  attacking the female protesters that had occurred on August
8  12.
9          Next I'd like to move on to the -- if there's any
10  other questions regarding the weight of the evidence, I'd be
11  happy to move on to the history and characteristics of the
12  defendant, Your Honor.
13          As I've noted before is that during part of this
14  offense -- not for the Unite the Right rally but for part of
15  this offense on August -- for Huntington Beach as well as
16  Berkeley is the defendant was on probation at the time of the
17  offense from the government's records and from his
18  conversations with the probation office, is that the
19  defendant's probation ran all the way until May 22 of 2017.
20  So his membership in the Rise Above Movement, as well as the
21  overt acts from Huntington Beach as well as Berkeley, all fell
22  within the time when he was on probation showing that he
23  committed part of the offense while on probation.
24          He does have -- that was for a prior conviction for
25  a criminal conviction for carrying a concealed weapon for

1    which he received seven-day sentence and then the three years

2    of probation.

3              He does have two failures to appear and that is with

4    respect to a traffic offense, but we don't believe that is any

5    indication of it being -- doesn't mitigate it much.  He has

6    two prior failures to appear.  And they had $10,000 in cash in

7    his residence when he was arrested on October 2 of 2018.

8              And finally is that when he was arrested, is that

9    when the FBI agents went to interview him, he did invoke but

10   asked what these charges were about.  And when told that they

11   were from Charlottesville, he referred to Charlottesville

12   judicial system as a kangaroo court.  In fairness to the

13   defendant, it's unclear whether he was referring to the state

14   system or the federal system, but, nevertheless, was

15   indicative of his view of the judicial system in any event.

16             In May of -- April and May of 2018 the defendant as

17   well as former R.A.M. -- other R.A.M. members traveled to

18   Europe, Germany, Italy, and Ukraine.  At all locations they

19   met with people affiliated or associated with the white

20   supremacist movement in all three of those.  Specifically, in

21   Germany they attended, on Adolf Hitler's birthday, the sword

22   and the shield festival, as well as one of the -- an MMA

23   fighting -- or MMA fighting event where Robert Rundo

24   participated.

25             In the Ukraine they -- Your Honor, as part of that,

1   on a ledger or a notebook that was found on Government Exhibit

2   14 in the defendant's apartment indicating that the Europe

3   trip was not for vacation; rather, it was part of one of the

4   goals for the Rise Above Movement organization, as the

5   defendant lists it as one of the goals and puts a check box

6   right beside it.

7          Government Exhibits 15 and 16 are from the

8   defendant's time in Ukraine, specifically Kiev, where in

9   Government Exhibit 15 he is making the throat-slashing gesture

10  again with insignia in the background that indicates the Azov

11  Battalion.  Azov Battalion is a wing or former wing of

12  Ukrainian National Guard which was notorious and known for its

13  white supremacist views and neo-Nazi ideology.

14         And then again on Government Exhibit 16 the

15  defendant is posing in front of the insignia for the Azov

16  Battalion as well as giving the Hammerskin salute.

17  Hammerskins are known as a -- they are a western violent white

18  supremacist organization with a presence in Southern

19  California.

20         And then for the time in Italy is that the defendant

21  spent several days at the CasaPound, that is with the

22  neo-fascist political party in Italy as well.

23         So the defense have -- and the defendant himself has

24  international contacts in this case which are relevant to

25  assessing his bond.  And in fact, one of his co-conspirators

1    and a founding member of -- one of the founding members of the

2    Rise Above Movement, Robert Rundo, fled or attempted to flee

3    to the Ukraine after the defendant's arrest in this case, not

4    once, but twice, and ultimately successfully fled into --

5    across the border into Mexico and into Elsalvador.  So one of

6    the co-conspirators in this case has already fled apprehension

7    from law enforcement authorities.

8          Fourth and finally, Your Honor, is the nature and

9    seriousness of danger to any person in the community, and I

10   will not reiterate some of the things I have already talked

11   about, which nevertheless speak to this, but I also want to

12   add that the -- in the defendant's search warrant I've

13   included two photographs here in Government Exhibit 17 and 18

14   are skull masks, as well as incendiary or smoke grenades.  And

15   in Government Exhibit 18 there was national socialist or Nazi

16   paraphernalia, a 12 gauge shotgun, a loaded .357, a knife with

17   a swastika insignia, a go bag with masks and scarf and

18   goggles.

19         Further evidence from the defendant's Facebook also

20   pauses concern for the defendant's -- provides cause for

21   concern for the defendant's dangerousness.  Specifically, in

22   August to November of 2017 the defendant engaged in an online

23   conversation with an individual in which they talk about many

24   things, the James -- the attack that was committed by James

25   Fields, for which he's been charged in a federal hate crime

```
 1    indictment, is that the defendant -- they had shared a meme
 2    that showed the Challenger by James Fields, and it said:
 3    Challenger time, commie swine.
 4          And that's less of a concern, but it was the
 5    defendant's response that was a concern, is that the defendant
 6    said that privately he enjoys that humor but publicly he
 7    doesn't think it's wise.  Why?  Because, quote, You're not
 8    living the 14 sitting in the joint.
 9          The 14 are 14 words that were espoused by Adolf
10    Hitler that is the mantra of many people in the white
11    supremacist movement that we must secure the existence of our
12    people and a future for white children.  And that the
13    defendant said that you can't live the 14 while you're sitting
14    in the joint.  And he then says that a movement needs to be
15    much -- needs to be big before it can get to that extreme to
16    be effective.  So his concern with the James Fields attack was
17    that it was premature, not that it was wrong, when you look at
18    this evidence.
19          And the person responds to him that a movement needs
20    to be -- that absolutely agreeing:  That's why just flash mobs
21    and outreach, to which the defendant replies back:
22    Absolutely.
23          And then also addressing the magistrate judge in
24    Central District of California, also noted that one of the
25    things that speaks to the defendants' danger in this case is
```

```
 1    their access to the internet, which is very difficult to

 2    police.  And specifically, that -- the magistrate judge said

 3    that much of the danger from the defendants and others come

 4    from their access to the internet and their ability to spread

 5    their message, as it were, and that can't be controlled if

 6    he's released on any kind of bond.

 7            And that there were -- also clear in the defendant's

 8    Facebook are other groups and other individuals seeing their

 9    actions in Charlottesville and at Berkeley and asking how can

10    I get involved, and how can I create a group just like that.

11    The defendant advising and promoting them on how to do that.

12            So Your Honor, in conclusion, all of the factors we

13    believe strongly support request for detention in this case.

14    For all four -- all other three defendants in this case, the

15    magistrate judge in California as well as Judge Moon all ruled

16    that there's no combination of conditions that can assure the

17    safety of the community, and in some cases they were returned

18    to court.  And for the co-conspirators in California, the

19    California case, the magistrate judge there found the same as

20    to all four of those defendants.  And we just respectfully

21    request that this Court find the same.

22            THE COURT:  All right.  Ms. Lorish?

23            MS. LORISH:  Thank you, Your Honor.

24            THE COURT:  Let me tell you this:  I do have a --

25    what should be a short call at 2 o'clock.  Do you want to just
```

```
 1    take a break now or do you want to start?  Not to interrupt
 2    you and just --
 3              MS. LORISH:  I'd like to say I'd be less than five
 4    minutes, but it's unlikely to be true.  Maybe we should take a
 5    break now.
 6              THE COURT:  Why don't we do that because I want to
 7    give you an opportunity to present your full argument, not cut
 8    you off.
 9              MS. LORISH:  Thank you.
10              THE COURT:  So we'll take a short recess.
11              THE MARSHAL:  All rise.
12              (A recess was taken from 2:00 p.m. to 2:29 p.m.)
13              THE COURT:  Ms. Lorish, you can go ahead.
14              MS. LORISH:  Thank you, Your Honor.
15              So first I want to start out by summarizing what the
16    release plan is that Mr. Daley is proposing today.  And so as
17    the Court can no doubt discern from the questions I asked his
18    mother, Mrs. Daley, earlier, and also the filings in this case
19    what we're proposing is that he be released on home
20    confinement and electronic monitoring conditions to the
21    residence of his parents in Oregon, and who would also both
22    agree to serve as third party custodians in this case to
23    ensure the defendant complied with the conditions of his
24    release, which we would expect would allow him to leave the
25    residence only for employment, which would be where his father
```

1    would drive him to and from employment with his father.  And

2    otherwise only to leave the home for AA meetings and then also

3    for any religious services.  And as an additional condition of

4    release that he would not have any access to the internet and

5    whatever other conditions, of course, the Court or the

6    government might suggest in addition to that would be the

7    baseline proposal.

8          And so first with respect to the -- that plan, we

9    would suggest that this release plan distinguishes Mr. Daley's

10   case from the co-defendants in this case who have been

11   detained so far as well as the defendants out in California.

12         I can't speak with perfect accuracy about all the

13   California defendants, but I do believe that no other

14   defendants in this Western District of Virginia indictment

15   have proposed a third party custodian proposed living with

16   relatives far from Los Angeles where essentially all this

17   alleged organizing and conspiring is supposed to have

18   occurred.  And so I think that is a distinguishing factor and

19   I think that Mrs. Daley -- I think we could trust

20   Mrs. Daley -- this Court could trust Mrs. Daley to pick up the

21   phone and to report then in the event that he did not comply

22   with one of the Court's orders, and that's an important

23   factor.

24         So I think the Court has to consider then with that,

25   as a possible release plan, does that satisfy and provide some

USA v. Benjamin Drake Daley - 3:18-cr-25        42

1   reasonable assurance that Mr. Daley will come back to court

2   when his trial which is currently set in January, and will he

3   be a danger to the community in that interim period of time.

4           And so of course the government has -- we've allowed

5   the government to proceed by proffer today in providing a lot

6   of evidence to the Court -- well, not really -- I mean

7   proffered evidence.  We have photographs.  We're not conceding

8   that those are photographs that were taken at large and public

9   sources and are not conceding -- are not contesting that

10  Mr. Daley was present at these rallies in Berkeley and

11  Huntington Beach and also in Charlottesville, but as is the

12  case with -- anytime we select a small snippet out of one day

13  there's a lot of context that has not been provided by

14  proffer, and for every single photograph there would be

15  backstory that explains how Mr. Daley found himself to be in

16  the scene depicted in each photograph.

17          And so in general without getting into the

18  details --

19          THE COURT:  Ms. Lorish, I'm not sure how that

20  backstory would explain or would help to explain his

21  circumstances considering he lived in California and the

22  government's proffer and sworn statements and the affidavits

23  submitted in support of the complaint would show that he

24  traveled from California and to participate in this rally and

25  was getting prepared for violent confrontations.  And that the

1   statements on R.A.M.'s website really support that, that that

2   is part of that group's mission and what they -- what they go

3   about doing.

4          MS. LORISH:  Well, what I think is relevant for the

5   Court to consider, Your Honor, is that at these -- so when the

6   defendant came to Charlottesville in August of 2017 he had

7   prior experiences of going to lawfully permitted rallies which

8   were pro-Trump rallies both in Huntington Beach and Berkeley

9   where there was a strong presence from, you know,

10  counter-protesters.  And in fact, the presence was so strong

11  that the Department of Homeland Security, who studied those

12  rallies, cited that the kind of counter-protesters which they

13  called anarchists or Antifa presence was part of the reason

14  that violence was incited at those lawfully organized

15  protests.

16          And so I think it's -- of course we have the video

17  evidence of what happened in Charlottesville.  But whether the

18  evidence is that -- is as uncontested as the government

19  suggests, that Mr. Daley traveled with the intent to incite a

20  riot versus to participate in a rally where there was a strong

21  presence from a counter-protest movement and was prepared for

22  the likelihood that there would be violence based on his prior

23  experiences, that's the difference.  Coming to a riot where

24  you know there's likely going to be violence or coming to

25  incite a riot.

1          And so that's -- you know, it's -- the Court can

2     consider the evidence the Court has for what happened in

3     Charlottesville, but that's the only context I was planning to

4     offer for the background, Judge.

5          There were many people arrested in Berkeley,

6     Huntington, that were on either side of the protest and

7     counter-protest line, so the defendant's expectation was, yes,

8     there was likely going to be violence.  And in fact, there

9     obviously was that day and on every participating side.  So --

10          THE COURT:  And I -- you know, I can't weigh into

11     that at this point, but, you know, the evidence in front of me

12     has statements from R.A.M. and pictures of Mr. Daley on their

13     website, and it's -- these statements are promoting violence

14     and promoting violence against groups with which it seems that

15     he disagrees.  And so it's -- there is certainly evidence to

16     support that he came to Charlottesville with the intent to

17     engage in violence and was quite prepared to do so.

18          MS. LORISH:  I think it's also relevant --

19          THE COURT:  And I -- you know, what's -- the

20     question or the issue in front of me is, you know, are there

21     conditions that -- that I can -- that I could impose on him

22     that would keep him from -- and reasonably assure me that he

23     wouldn't engage in that sort of conduct while he is -- while

24     he is on bond.

25          MS. LORISH:  And as to that question, there's no

1    evidence that Mr. Daley has participated at any political

2    rallies in the United States since August of 2017, or that

3    he's been involved in any other acts of violence or any other

4    assaults of any kind since August of 2017.  The government has

5    obviously been aware and kind of watching him closely in the

6    intervening time period.  He did travel outside the United

7    States, as there's been proffered evidence.  There's no

8    violence associated with him in any of those travels.  And so

9    I think the intervening time period of now 15 months is

10   relevant for the Court to consider.

11          It's also with respect to -- and on that point,

12   there have been political rallies that have turned violent in

13   those intervening time periods where many of the same groups

14   that participated here in Charlottesville on August 11 and 12

15   did show up.  Mr. Daley and the individuals he associated with

16   in Los Angeles were not among those, in Portland or in other

17   cities in the last 15 months.

18          So I think this Court can have assurance that

19   Mr. Daley will come back to court.  He has the financial

20   resources being offered by his parents to get him back here.

21   Can be assured through homeland kind of monitoring that he's

22   going to stay in Oregon away from these other individuals and

23   not participate in any future rallies of any kind or any

24   organizing online.  And that should satisfy the Court.

25          His only criminal history at this point besides the

1    traffic offenses -- and while he did -- you know, he was

2    young.  He didn't take seriously when he was supposed to

3    appear in court, but he had completely paid off those fines

4    and offenses now and took care of that traffic offense.  He

5    did come to court for his concealed carry conviction.  Came to

6    all those things.  And, you know, the government alleges that

7    the tail end of that three years of probation was when some of

8    these activities were happening in California, but, you know,

9    from his probation officer's perspective in California he

10   completed all the terms of his probation and -- you know,

11   apart from these allegations now.  And so he -- you know, and

12   the fact that a co-defendant attempted -- or co-defendant out

13   in California attempted to flee the country does not suggest

14   that, you know, Mr. Daley would do that.  He doesn't have a

15   passport.  He tried to renew his passport in the last year and

16   the government held it and never gave it back to him.  All of

17   his cash was seized.  He ran a cash business in California

18   which explains why he had cash in his residence.  So he has no

19   financial means to flee.

20          And so we think all those factors together would

21   support his being released on very restrictive conditions.

22   Thank you, Your Honor.

23          THE COURT:  All right.  Mr. Kavanaugh, anything else

24   that you want to say?

25          MR. KAVANAUGH:  Your Honor, very briefly is that

 1   defendant Michael Miselis, his release plan also was to third
 2   party custodians to his parents as well, and much like in that
 3   case we maintain that, notwithstanding the efforts of the
 4   parents, is that we still don't believe that there is
 5   sufficient conditions or accommodation conditions that could
 6   assure the safety for him to return to court.
 7           THE COURT:  All right.  Let me -- let me just take
 8   about five or ten minutes.  I want to review the things that
 9   you-all have presented today and consider this just for a few
10   more minutes, and then I'll -- I'll be back.
11           THE MARSHAL:  All rise.
12           (A recess was taken from 2:39 p.m. to 2:52 p.m.)
13           THE COURT:  Well, first as to the Court's authority
14   to make a decision on Mr. Daley's request for bond, I do think
15   that I have the ability to address the request in large part
16   because the decision from the magistrate judge in California,
17   I think it noted that at least in the bond report, that his
18   parents hadn't provided any information.  And Ms. Lorish at
19   this point has put together, you know, a serious bond plan for
20   Mr. Daley.  And I think -- I think that alone would provide a
21   factual basis for reconsideration.
22           I don't think that there is a basis to reconsider
23   the legal issue of having a detention hearing.  I think a
24   magistrate judge in California made that determination, and
25   even if I could reconsider it I would agree with that judge's

1    decision that Mr. Daley does present a serious flight risk so

2    that I can consider and hold a detention hearing.  And the

3    information there would be, you know, there were a couple of

4    failure to appears, but, you know, those are I think of a

5    lesser concern, that he was on probation while it's alleged

6    that he committed acts of violence in California, in

7    Huntington Beach, and also in Berkeley.  There's some

8    international travel and some ties to groups outside of the

9    United States that are related to his participation in R.A.M.,

10   which is directly related to the alleged offenses here.  And

11   then there's also some evidence about -- about Mr. Daley

12   having the wherewithal to cover financial tracks.

13          And I think that all of those things give me the

14   ability or would give me the ability, were I to reconsider the

15   magistrate judge's decision, to hold a detention hearing and

16   find that there at least is this threshold showing of a

17   serious risk of flight so that I can have a detention hearing.

18          So then that moves on to whether there are

19   conditions of release that I could place on you that would

20   reasonably assure me that you wouldn't be a danger to the

21   community or would present of a flight risk and that you

22   wouldn't show up to court.

23          Now, I think on the flight risk it's -- you know,

24   it's close, but I think Ms. Lorish has put together a plan

25   that could likely address the concerns that I have there.  And

1   based on the factors that I have already identified, the plan

2   that Ms. Lorish has presented is that she offers Mr. Daley's

3   parents to serve as third party custodians and then have him

4   live in their home and work for his father in the construction

5   business and that there would be electronic monitoring and --

6   and a number of other factors.

7          And, you know, hearing Mr. Daley's mother testify

8   today, it shows me that his parents are very conscientious and

9   have gone to great lengths to help their son in the past and

10  to successfully help him when he was struggling with abuse to

11  controlled substances and that you-all took firm and difficult

12  steps then and followed through with them to really help him

13  and to put him in a -- in a much better situation and to...

14  And so that gives me some confidence that you-all would do

15  your best to make sure that he adhered to any conditions that

16  I would put on him.

17         Somewhat undermining that is that there's evidence

18  that was presented today that -- that Mr. Daley got things

19  from his parents, some suggestion that -- to help cover his

20  financial tracks for coming to Charlottesville, that he had

21  his mother unwittingly assist in that by using her credit card

22  and paying her back for the plane travel.  Concealing that

23  information from her gives me some pause about -- about

24  whether the plan would be effective.

25         But the real -- the real concern, I think, and the

USA v. Benjamin Drake Daley - 3:18-cr-25          50

 1    concern that pushes it over the edge for me is the -- is the

 2    danger to the community that Mr. Daley presents.  At this

 3    point they are allegations, they are allegations in a

 4    complaint.  There have been proffers presented in open court;

 5    there have been pictures in support of the proffers.  And this

 6    is evidence before the Court, and there certainly is going to

 7    be --

 8         Mr. Daley, I understand that Ms. Lorish has -- is

 9    developing your case and defenses in your case at this point,

10    but, you know, what I have in front of me, the allegations and

11    some other evidence would show that -- that you were involved

12    in founding a group that at least in part the purpose was to

13    train for violence, train for combat.  And it -- and this

14    violence would be directed towards people who had different

15    views than you, people of different genders, people of

16    different races, people -- different religious backgrounds.

17    And that there were two incidents in California while you were

18    on probation where this group that you're involved with was

19    involved with violence.

20         And then in August of 2017 there's, you know, the

21    travel across the country to engage in similar acts of

22    violence against similar people who had different views than

23    you.  And that these events in Charlottesville occurred one

24    night on August 11 and then also the next day.  And that

25    there's pictures of you actively hurting people.  And then

1   that afterwards the acts of recruiting and promoting this

2   group encouraging others to -- to engage in this sort of

3   conduct continued.

4         And it's these things that I just -- the nature of

5   the offense and these continuous acts in a number of different

6   places that just tell me that I can't be reasonably assured

7   that there are any conditions that I could put on you that

8   would ensure the safety of the community.  And so it's really

9   on the dangerousness that I do find that the detention is

10  necessary in this case.

11        Now, is there anything else that we need to take up,

12  Mr. Kavanaugh?

13        MR. KAVANAUGH:  No, Your Honor.

14        THE COURT:  Ms. Lorish?

15        MS. LORISH:  Not today, Judge.

16        THE COURT:  I will enter a written order on this as

17  well.  Court will stand adjourned.

18        THE MARSHAL:  By direction of His Honor, this United

19  States District Court stands adjourned for the day.

20  (End of FTR recording at 3:02 p.m.)

21                        CERTIFICATE

22        I, Mary J. Butenschoen, certify that the foregoing

23  is a correct transcript from the record of proceedings in the

24  above-entitled matter.

25  /s/ Mary J. Butenschoen                    4/12/2019